• Did those who knew the person best during the developmental stage-his family, friends, teachers, employers, authorities-think he was mentally retarded at that time, and, if so, act in accordance with that determination?
• Has the person formulated plans and carried them through or is his conduct impulsive?
• Does his conduct show leadership or does it show that he is led around by others?
• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
• Does he respond coherently, rationally, and on point to oral or written *557 questions or do his responses wander from subject to subject?
• Can the person hide facts or lie effectively in his own or others' interests?
• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?[13]
2. The Habeas Court's Approach
Changes have occurred since our decision in Briseno . What used to be referred to as "mental retardation" is now labeled "intellectual disability," and the AAMR has renamed itself the American Association on Intellectual and Developmental Disabilities (AAIDD).[14] The habeas court in this case reasoned that more has changed than names and labels and that, in assessing whether a person is intellectually disabled, courts should use the most current standards of psychological diagnosis.[15] The habeas court further concluded that, under the current standards, use of the Briseno factors was discretionary, and, because it perceived no evidence that Applicant had a personality disorder, unnecessary in this case.[16]
3. Our Prior Opinion
In our prior opinion reviewing the present habeas application, we adhered to the framework for determining intellectual disability that was set out in Briseno .[17] We said that, absent legislative action, the decision to modify the legal standard for intellectual disability "rests with this Court," and we believed that the legal test we established in Briseno remained adequately informed by the medical community's diagnostic framework.[18] We concluded that we should continue to adhere to the AAMR definition of intellectual disability that existed when Briseno was decided, even if the positions of the American Psychiatric Association (APA) and the AAIDD had changed since then.[19]
Regarding the subaverage-intellectual-functioning prong of the Briseno inquiry, we disagreed with Applicant's reliance upon all the various tests he had taken with scores ranging from 57 to 78.[20] We held that only two of the tests resulted in scores that were relevant and reliable enough to warrant consideration: a WISC test taken in 1973 at age 13 with a score of 78 and a WAIS-R test taken in 1989 at age 30 with score of 74.[21] Taking into account the standard error of measurement of five points for each test resulted in IQ score ranges of 73-83 and 69-79 respectively.[22]
We criticized the habeas court for subtracting points from IQ scores based on *558 the so-called "Flynn Effect" (the concept that IQ tests become outmoded with the passage of time, causing purported IQ scores on the test to rise).[23] Rather, we held that the outmoded nature of the test is simply something that might be considered in determining whether a person's actual IQ likely fell in the lower end of the standard error range for the test in question.[24] We also suggested that factors that tend to depress an IQ score-family violence, an impoverished background, drug use, and depression-would tend to place a person's actual IQ within the higher portion of the standard error range.[25] Considering these factors, we concluded that we had no reason to doubt that Applicant's IQ scores on both tests were accurate reflections of his actual IQ, and because both were above 70, that would place Applicant in the range of borderline intelligence rather than intellectual disability.[26] We concluded that Applicant had failed to prove significantly subaverage general intellectual functioning and therefore failed to meet the first prong of the three-pronged test.[27]
Nevertheless, we also assessed the second prong of the test, regarding adaptive deficits.[28] We criticized the habeas court for relying upon a definition of intellectual disability presently used by the AAIDD that omits a requirement that an individual's adaptive deficits be related to significantly subaverage intellectual functioning.[29] We also held that the Briseno evidentiary factors remained relevant to assessing adaptive deficits, and we held that we must look to all of the person's functional abilities, including those that show strength as well as those that show weakness.[30] We concluded that the Briseno factors weighed heavily against a finding that any adaptive deficits were related to significantly subaverage intellectual functioning.[31] In rejecting Applicant's claim that he had shown sufficient adaptive deficits,[32] we made a number of other observations, but we will discuss those later in the application section of this opinion.
4. The Supreme Court's Response
The Supreme Court held that we were wrong to conclude that Applicant's IQ scores were, by themselves, a sufficient basis for rejecting his claim of intellectual disability.[33] The Court did not dispute our decision to rely upon scores from only two of the tests, so that we considered only the scores of 74 and 78, but the Court stated that, because of the standard error of measurement, a score of 74 was not high enough to rule out intellectual disability.[34] The Court criticized our reliance on various *559 factors (family violence, an impoverished background, drug use, and depression) to disregard the lower end of the standard error of measurement range.[35] The Court admonished that, if any part of the range of scores yielded by the standard error of measurement was 70 or below, then an examination of adaptive functioning was required to resolve the issue of intellectual disability.[36] Because the five-point standard error of measurement applicable to the test with a score of 74 yielded a range of 69-79, an examination of adaptive functioning was required.[37]
The Court also criticized some of our analysis of adaptive functioning. The Court said that we were wrong to suggest that adaptive deficits in certain areas could be offset by strengths in unrelated areas.[38] The Court also concluded that we overemphasized Appellant's behavior in prison, and it cautioned against relying on adaptive strengths developed in a controlled setting, "as a prison surely is."[39] The Court further suggested that we erroneously viewed Appellant's record of academic failure and his childhood abuse as detracting from a finding of intellectual disability because the medical community counts traumatic experiences "as 'risk factors' for intellectual disability."[40] And the Court held that we departed from clinical practice by requiring Applicant to show that his adaptive deficits were not related to a personality disorder because personality disorders often co-occur with intellectual disability.[41]
Perhaps most importantly, the Supreme Court criticized our reliance on Briseno 's evidentiary factors for assessing adaptive functioning.[42] These factors, the Court found, merely advanced lay stereotypes of the intellectually disabled and were an outlier in comparison to other states' handling of intellectual disability claims and even to Texas's own practices in other contexts.[43] Even the dissenting opinion, by Chief Justice Roberts, criticized our reliance on the Briseno factors.[44]
5. Our Response: Adopting the DSM-5 Approach
"The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."[45] In Moore , the Supreme Court indicated that the DSM-5 embodies "current medical diagnostic standards" for determining intellectual disability.[46] When observing that the Briseno factors were inconsistent with Texas's own practices in other contexts, the Court referred to Texas's reliance on *560 "the latest edition of the DSM."[47] The Supreme Court also observed that the DSM-5 retains a requirement that adaptive deficits be related to intellectual functioning deficits[48] -a requirement no longer explicitly retained by the AAIDD manual.[49] Given Texas's reliance on the DSM-5 in other contexts, and the logic of requiring that adaptive deficits be related to deficient intellectual functioning, we conclude that the DSM-5 should control our approach to resolving the issue of intellectual disability.[50] Although we retain a "relatedness" requirement in conformity with the DSM-5, we abandon reliance on the Briseno evidentiary factors in determining whether such a requirement is met.
The DSM-5 retains the three-pronged approach to intellectual disability but refines it. The three criteria for finding someone to be intellectually disabled are: (A) deficits in general mental abilities, (B) impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers, and (C) onset during the developmental period.[51]
"Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding."[52] Components of these functions include "verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy."[53]
The typical method of assessing these functions is through "individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence."[54] A score is indicative of intellectual disability if it is "approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points)."[55] When the standard deviation of the test is 15 and the mean is 100, a score that is two standard deviations below the mean will be "a score of 65-75 (70 ±5)."[56] Practice effects and the "Flynn effect" may affect test scores.[57] Invalid scores may result from brief screening tests or group administered tests or when there are highly discrepant individual subtest scores.[58] Tests must also be normed for the individual's sociocultural background and native language.[59]
*561 Criterion B, deficits in adaptive functioning, refers to "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background."[60] This involves adaptive reasoning in three domains: "conceptual, social, and practical."[61] The conceptual domain is also referred to as "academic" and involves things like "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations."[62] The social domain involves things such as "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities, and social judgment."[63] The practical domain involves such things as "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization."[64]
Adaptive functioning is assessed by both clinical evaluation and testing.[65] Testing should be culturally appropriate and psychometrically sound.[66] Such tests should use standardized measures with knowledgeable informants such as family members, teachers, counselors, and care providers, as well as the individual being assessed, if possible.[67] Other sources of information include "educational, developmental, medical, and mental health evaluations."[68] All of this information "must be interpreted using clinical judgment."[69] "Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained."[70]
Criterion B is met "when at least one domain of adaptive functioning-conceptual, social, or practical-is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community."[71] For school-age children and adults with mild intellectual disability, "there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations."[72] In adults with mild intellectual disability, "abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility) and short-term memory, as well as functional use of academic skills (e.g. reading, money management), are impaired."[73] Individuals with mild intellectual disability may have difficulty perceiving peers' social cues, tend to use more concrete or immature language in communicating, and are at risk of being manipulated by others.[74] "To meet diagnostic *562 criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A."[75]
Criterion C recognizes that the intellectual deficits must have been "present during childhood or adolescence."[76]
B. Application
1. Adaptive Deficits Inquiry Required
The two IQ tests that we accepted on original submission as having validity with respect to assessing Applicant's general intellectual functioning yielded scores of 74 and 78.[77] Because the score of 74 is within the test's standard error of measurement for intellectual disability (being within five points of 70), we must assess adaptive functioning before arriving at a conclusion regarding whether Applicant is intellectually disabled.[78]
2. Dr. Compton's Opinion is Credible and Reliable
On original submission we found the State's expert-Dr. Compton-to be "far more credible and reliable" on the issue of adaptive functioning than the experts presented by the defense.[79] We pointed out that the record showed Dr. Compton's considerable experience in conducting forensic evaluations.[80] Dr. Compton "thoroughly and rigorously reviewed a great deal of material concerning applicant's intellectual functioning and adaptive behavior," administered comprehensive "gold-standard" IQ testing, and personally evaluated Applicant.[81] By contrast, we observed that the defense psychologists-Borda, Greenspan, and Anderson-reviewed relatively limited material.[82] Greenspan did not personally evaluate Applicant, Borda's personal evaluation of Applicant was brief, and Anderson's personal evaluation was for a purpose other than evaluating intellectual disability.[83] And we would add that Borda's current conclusion that Applicant is intellectually disabled differs from the conclusion he arrived at in 1993, when he talked to Applicant's attorneys and testified in connection with an earlier habeas hearing.[84] Notes from Applicant's attorneys at that time show Borda saying that he did not consider Applicant to be intellectually disabled.[85]
Dr. Compton's methodology is consistent with the Supreme Court's dictates for evaluating intellectual disability. She explained that the major emphasis in an intellectual disability inquiry is "with adaptive deficits or adaptive functioning. That is primary. It supersedes the, you know, raw intelligence score." She further explained that "somebody could have an IQ of 75 but have exceedingly low adaptive functioning and qualify for a diagnosis of intellectual disability." She pointed to the three criteria for evaluating intellectual disability as well the three domains for evaluating adaptive deficits, and she referred to various *563 adaptive areas that are cited in the DSM-5. She also talked about the various risk factors for intellectual disability and acknowledged that Applicant had some of those.
Dr. Compton rarely testified for the prosecution with respect to intellectual disability litigation in death penalty cases. Forty percent of the time she worked for the defense, and fifty percent of the time she worked directly for a court. She worked for the prosecution only ten percent of the time. She testified that she was not a fan of the death penalty and "took no joy" in giving her opinion in this case.
3. Dr. Compton's Opinion: Adaptive Functioning Does Not Support Intellectual Disability Diagnosis
As we explained on original submission, Dr. Compton testified that, even before he went to prison, the level of Applicant's adaptive functioning was too great to support an intellectual-disability diagnosis.[86] Specifically, Dr. Compton concluded:
I think there is a greater probability than not that Mr. Moore suffers from borderline intellectual functioning. I do not believe-I do not have the data to support a diagnosis of mental retardation, simply because the adaptive functioning, I think, has been too great. Even before prison, I mean, there's indications of adaptive skills. So, I just-I do not have the adaptive deficits for a diagnosis.
* * *
I believe that I don't have enough information on his adaptive deficits or adaptive-I do not believe there's enough adaptive deficits to diagnose him with mental retardation. I do think he has below average intelligence but I do not believe there's enough in the record or from what I've seen to qualify for that diagnosis.
A substantial amount of evidence in the record substantiates Dr. Compton's conclusion and is contrary to various findings made by the habeas court. In the area of conceptual skills, the habeas court found that applicant had deficits in the area of communication, citing a speech impediment,[87] that he had deficits in reading and writing,[88] that he had difficulty with math,[89] and that he was in general a "slow learner."[90] As will be discussed below, a good deal of evidence contradicts these conclusions. The habeas court found Applicant lacking in the area of social skills based on his withdrawn behavior as a child and low conduct scores on his report card. As will be discussed below, the evidence relied upon by the habeas court is limited and does not account for the social skills that Applicant has shown as an adult. In the area of practical skills, the habeas court concluded that Applicant lacks many practical life skills, cannot maintain a safe environment, and cannot live independently. As we shall see, some of the cited lack of skills are due to the lack of opportunity to learn while other conclusions about Applicant's practical skills conflict with the record.
4. Communication Skills
To begin with, a conclusion that Applicant had difficulty communicating is at odds with his ability to testify at trial and to advocate for himself after trial.
*564 Applicant testified both at a hearing on a motion to suppress his written statement and during the defense's case-in-chief at the guilt phase.[91] His testimony was coherent and sometimes lengthy.[92] Dr. Compton said that Applicant's responses to questions during his trial showed that he could "conceptualize what was being asked and form exculpatory statements or responses" and indicated "an ability to engage in abstract reasoning to some degree."[93]
When Applicant became dissatisfied with his appellate representation, he filed a pro se petition for a writ of mandamus, and a hearing was held on the matter.[94] At that hearing, Applicant advocated on his own behalf and presented five exhibits.[95] The exhibits included letters Applicant had written to his attorneys, several of which he read aloud at the hearing without any apparent difficulty.[96] When it became evident that Applicant was unaware that his attorney had filed a brief, the hearing was recessed to allow Applicant to review it.[97] Although Applicant did not understand all of the legal arguments in his attorney's brief, he responded rationally and coherently to questions regarding whether he understood and was satisfied with the issues his attorney had raised.[98] The trial court ultimately granted Applicant the relief he sought in his pro se pleading and *565 appointed a new appellate attorney.[99] And although this new attorney filed a brief, Applicant also filed his own supplemental pro se brief, which made cogent arguments based on applicable caselaw, including then-recent Supreme Court caselaw.[100]
Applicant's communication skills were also shown in various letters he wrote and in his ability to influence others, which we will discuss in detail later in connection with other adaptive traits. At the 1993 habeas hearing, Borda had testified that he saw nothing to indicate "really severe deficits in communication skills" and that Applicant was "able to communicate adequately."[101]
5. Language Skills (Reading and Writing)
Regarding Applicant's ability to read and write, the evidence showed that, in prison, he progressed from being illiterate to being able to write at a seventh-grade level. Compton testified that seventh-grade level writing was demonstrated by Applicant's personal handwritten correspondence.[102] The pro se motions and pleadings that Applicant filed-some of which were handwritten-evidenced an even greater level of writing ability. And according to Dr. Compton, even if it were assumed that someone else composed those documents, Applicant's ability to copy such documents by hand would indicate an understanding and ability to write that would be within the realm of only a few intellectually disabled people.[103]
Cloteal Morris, Applicant's mother's cousin, testified at Applicant's 2001 punishment retrial that Applicant had written her beautiful letters from prison about church and religion.[104] Alice Moore, Applicant's maternal aunt, said that Applicant wrote letters to her from prison and described them as "just normal letters."[105] Jo Ann Cross began corresponding with Applicant in 1993. She testified that Applicant's writing style, spelling, grammar, and use of language improved during their period of correspondence.[106] Cross arranged for Applicant to receive newspapers and articles, which they discussed during the correspondence, and Applicant exhibited "a greater deal of understanding of all sort of issues, be it culture issues [or] politics" than he had at the beginning of their correspondence.[107] When Cross's mother died in 1996, Applicant wrote Cross "a very moving letter" about her death.[108] At the 2014 habeas hearing, Colleen McNeese, one of applicant's sisters, testified that Applicant's reading and writing ability had greatly improved since his imprisonment.[109]
Dee Dee Halpin, an educational diagnostician called by the defense at the 2001 retrial, stated that a letter Applicant had recently written, though containing some errors, was "certainly coherent," "fairly complex," and "adult like."
*566 When Dr. Compton went to evaluate Applicant, there were books (including a copy of the Qu'ran), a newspaper, and newspaper articles in Applicant's prison cell.[110] One of the newspaper articles was about winning an appeal, and many of the books and newspaper articles contained underlining.[111] Dr. Compton stated that underlining was often an indication that the person read and understood the text.[112] But, she said, even if the underlining was taken as a sign that the person did not fully understand the text and wished to review it later, doing so would still involve processing and conceptualizing and would imply understanding of the surrounding text.[113] Applicant's cell also contained a composition notebook, in the same handwriting throughout, that contained some material that could have been copied and some material that could have been a product of Applicant's independent thought.[114] The notebook also contained a handwritten table matching the Wechsler Scales's normal distribution of IQ scores, which indicated to Dr. Compton that Applicant was investigating IQ scores from his cell.[115]
6. Math and Money Skills
Although Applicant had poor grades in elementary school and struggled with both language and math on testing in the early elementary years, his math score in fifth grade on the Iowa Test of Basic Skills was within the average range.[116] Colleen McNeese testified that, in second and third grade, Applicant could not tell a $1 bill from a $5 or $10 bill.[117] However, she acknowledged that after Applicant learned to read, he was able to distinguish the denominations on bills.[118] She further acknowledged that, in prison, his ability to count had greatly improved.[119]
The prison commissary records indicated that Applicant's math skills were fairly well-developed. Jerry LeBlanc had worked at the commissary unit for fourteen years and had interacted with Applicant numerous times. LeBlanc did not help Applicant complete commissary forms, and to his knowledge, no one else did.[120] Although there was a cell adjacent to Applicant's on death row, the unit moved death row inmates frequently, so Applicant did not have the same neighbor for significant periods.[121] According to LeBlanc, there were recent examples of Applicant composing orders that came within the $85 spending limit.[122]
The habeas court found that the commissary slips contained "numerous mathematical and spelling errors," that the goods requested for Applicant often were well in excess of the spending limit, that Applicant was only within the $85 spend limit on two occasions, and that Applicant "orders almost the same thing every time."[123] This was based on the habeas *567 court's examination of what it characterized as "the 24 commissary order slips in evidence," which included examples ranging from 2012 to 2013.[124] We conclude that these findings, though in accord with the record in some respects, are also at odds with the record in some respects.
To begin with, the habeas court appears to have reviewed only the commissary slips in State's Exhibit 23, which contained twenty-four commissary slips ranging from 2012 to 2013. But State's Exhibit 26 was also admitted into evidence, and it contained twenty-two commissary slips ranging from 2010 to 2011. Further, the habeas court's conclusion that Applicant ordered almost the same thing every time does not to us seem consistent with a review of the slips in evidence. There are many items that recur from time to time, and some of the prices are the same, but nearly every slip seems to have a unique combination of items and prices. LeBlanc testified that the commissary price list changed frequently.[125]
To what extent Applicant's commissary slips met the $85 spend limit is a more complicated question than we appreciated on original submission, but it is also more complicated than was appreciated by the habeas court. Most of the slips contain some items that are marked through with a line. LeBlanc testified that the commissary staff would mark a line through an item if the item was out of stock. Many of the slips also show quantity reductions in various items. Some of the slips also contain a dollar sign ("$") on items marked through, which suggests a recognition by someone-Applicant or the commissary staff-that items were being struck out due to exceeding the spend limit. To what extent items were marked through by Applicant versus by the commissary staff is unknown. If one counts only the items that are not marked through in calculating the "spend total," and accounts for any quantity reductions, Applicant was more often than not within the spend total for commissary slips contained in State's Exhibit 23 and nearly always within the spend total for commissary slips contained within State's Exhibit 26. If items that were marked through are counted (and quantity reductions ignored), then most commissary slips exceeded the spend total.[126]
Even if we concluded that all of the mark-throughs and quantity reductions were made by commissary staff, that does not necessarily show that any failure to abide by the spending limit was due to adaptive deficits on Applicant's part. Applicant might have purposefully requested excess items to account for the possibility that some of his items would turn out to be out of stock. Inmates were allowed to specify substitute items, which seems to be a recognition that an item might not currently be in stock even if it was on the list. In addition, LeBlanc testified that certain types of property items (such as a hot pot) required special approval. Once the item was approved, then it would appear on the commissary request. It is unclear from the testimony whether these specially approved items are supposed to be part of *568 the spend total. And there may be other reasons for Applicant to make requests in excess of the spend limit that do not indicate a lack of understanding on Applicant's part.
What we can say about the commissary slips is that they required Applicant to add or multiply when he ordered multiple quantities of a particular item. For each line item, there is a box for the quantity, a box for the unit price, and a box for the total price. The vast majority of the time, Applicant's calculations of the total price from the quantity and the unit price are correct. Many of his commissary slips contain no math errors at all. And at least some of the calculations would in practical terms require multiplying a two-digit number by another two-digit number.[127]
A few of the commissary slips contain what appear to be up to three possible errors, but many of these may not be errors at all. Sometimes a line item specifies a quantity that may actually be a pack or two packs of an item. For example, Applicant would specify twelve Ibuprofen tablets, but the unit price and the total price would be the same-suggesting that what is being ordered was a twelve-pack.[128] Or Applicant would order ten bars of soap, and the total price would be twice the unit price, which appears to mean that the soap came in packs of five.[129] Also, Applicant would often specify substitute items on the same line, and they were not necessarily in the same quantities, which could complicate an attempt at a straightforward calculation of the final price from the quantity and the unit price. Some ostensible errors may also be writing legibility issues rather than actual errors in calculation.
A few entries appear to be errors but would not be if Applicant had ordered a different quantity of the item-suggesting the likelihood that Applicant changed his mind about how many of an item he wanted and did not recalculate the price.[130] A few entries are clearly calculation errors. But these relatively few errors are not consistent with the habeas court's conclusion that the mathematical errors were "numerous." Overall, the commissary slips support the conclusion that Applicant has well-developed math skills.
Moreover, LeBlanc testified that Applicant had occasionally brought mistakes made by the commissary to his attention, when Applicant had been charged for more items than he received.[131] LeBlanc never had the impression that Applicant did not understand "what's going on with his commissary."
*569 Further support for the conclusion that Applicant had well-developed math skills can be found in Dr. Compton's testing. One of the tests she conducted, the WRAT-4, was a test of academic abilities.[132] Applicant was able to perform relatively complex math calculations on one portion of that test but failed to correctly perform simpler math calculations elsewhere on the test.[133] These inconsistent results led Dr. Compton to conclude that there was an increased probability that Applicant was not exerting full effort on the test.[134]
Dr. Compton also noted that Applicant's practice of playing pool for money and mowing lawns before he went to prison shows "some ability to understand money concepts and work."[135] And after he went to prison, Applicant played dominoes, a game that requires counting.[136]
7. Learning Ability
Dr. Compton testified that IQ tends to remain constant over time and that it is unlikely that a person who is intellectually disabled at one point in his life will reach a point at which he is no longer intellectually disabled. As we have observed above, the DSM-5 indicates that even people with "mild" intellectual disability have difficulty learning to read, write, do math, and handle money.[137] We take into account the warning from the Supreme Court, as well as the DSM-5, that we should be cautious about relying upon adaptive strengths developed in a controlled setting such as prison. Nevertheless, even taking into account the controlled nature of the setting, the amount and pace of Applicant's improvement in reading and writing is simply inconsistent with the habeas court's description of Applicant as a "slow learner."
Even as early as 1971, Applicant was evaluated (in response to IQ testing) as possibly being "a child who has not been taught, but who can learn."[138] Halpin testified at Applicant's 2001 retrial that Applicant "definitely had some ability to learn that wasn't tapped early in his school years."[139] Bettina Wright, a clinical social worker called by the defense at the 2001 retrial, testified at that time that Applicant was "nowhere near retarded" and that his ability to learn was "very intact."[140] Dr. Compton found that both Halpin and Wright attributed Applicant's withdrawn behavior to emotional problems that were not recognized or dealt with appropriately in childhood and that the progression of Applicant's abilities in prison indicated "a strong ability to learn."
In fact, defense counsel argued in closing at the 2001 retrial that "we learned later from the experts and other people who looked at [applicant's school records] that he wasn't really [intellectually disabled] at all, he was capable of *570 learning."[141] Defense counsel further asserted that it was not until Applicant went to prison, away from his abusive family environment, that he was "safe enough to be able to learn and grow and become the kind of person that he could have become had he come from a safe environment."[142]
8. Social Skills
The habeas court's discussion of Applicant's social skills is brief, spanning little more than a page in the findings. The habeas court found Applicant to be deficient in the area of "interpersonal relations" on the basis of three brief and isolated statements: (1) a statement in a kindergarten evaluation that Applicant was "very withdrawn-maybe retarded but most likely emotional problems" and a recommendation that he be referred for psychological testing and to a counselor, (2) a statement in a psychological evaluation report conducted approximately seven years later that the reason for the referral was that Applicant was "below grade level; withdrawn; takes no part in class unless called on," and (3) a statement by Applicant that "it always seemed like people disliked me" and that a teacher singled him out for special treatment by placing his desk alongside hers to stop other children from teasing him.[143] The habeas court found that Applicant was deficient in the area of "following rules" because he had a general conduct grade of "Unsatisfactory" on an elementary school report card that was based on below-average scores in the categories of "Disciplines Himself," "Is Courteous," "Respects Property Rights," "Is Attentive," "Follows Directions," "Participates Well in Class Activities," and "Does Neat and Orderly Work."[144]
The evidence upon which the habeas court relied is a minimal basis upon which to conclude that Applicant lacks social skills. And even this evidence fails to suggest that the cause of Applicant's deficient social behavior was related to any deficits in general mental abilities, suggesting instead that the cause was "most likely emotional problems."
Evidence from Applicant's adult life indicates that he has progressed beyond being withdrawn and is able to have significant social interactions. He had a girlfriend, Shirley Carmen, and he played pool, dice, and dominoes with peers.[145] The manager of a restaurant wrote in a disciplinary report that Applicant was "capable of influencing others to dissent, likes confrontation."[146] Although Dr. Compton addressed the idea of influencing people as a conceptual skill, it also shows social skill in interacting with people. Applicant also displayed a social ability to interact with and stand up to authority when he refused to mop up some spilled oatmeal, saying that he was not a hall porter and mopping was not his job.[147] And while in prison, Applicant had two pen pals, Cross and her mother. Dr. Compton noted that Applicant had responded in an emotionally appropriate way in letters to Cross and "had grown immensely as a person."
Some of the habeas court's statements about Applicant's practical skills might also be relevant to his social skills. The habeas court cited testimony from family and friends that Applicant was "always a *571 follower," "always allowed those around him to make decisions for him," was "impressionable," and was "easily led."[148] But this evidence cannot be squared with the testimony of more objective witnesses that Applicant influences others and stands up to authority. In addition to the mopping incident, there were a number of incidents in prison in which Applicant refused to follow orders.[149] Although adaptive behavior may in general be expected to be higher in the controlled setting of the prison environment than in the "free world," standing up to authority is one trait that the prison environment would be expected to suppress. Applicant's willingness to stand up to authority in prison (and at times give reasoned explanations for doing so) is at odds with the claim that he is an impressionable, easily-led follower.
9. Practical Skills
The habeas court found that there was no evidence that Applicant was able to live independently of his family.[150] But the record shows that, at age fourteen, Applicant lived in the back of a pool hall for a while and stole food from stores.[151] Dr. Compton cited this as an indication of adaptive behavior.[152] Even the habeas court cited the fact that Applicant " 'lived on the streets' for most of his teenage years" or slept "on neighborhood porches or in cars" without asking for family help.[153] Dr. Compton testified that "in order to survive on the streets, obviously he had to engage in some adaptive behavior." In addition, Applicant had enough independence to possess his own guns: he was the one who supplied the weapons-a shotgun and a .32 caliber pistol-for the robbery that led to the capital murder in this case.[154]
The habeas court also found that Applicant had "never held a real job,"[155] but the record shows that he worked at the Two-K restaurant.[156] And even if the record did support the habeas court's finding, there is nothing to suggest that any failure by Applicant to get a job would be related to intellectual deficits rather than to the fact that he did not need a job because he was making his living by robbing people. The habeas court faulted Applicant for getting ptomaine poisoning twice from eating out of the neighbors' trash cans when he was a child because he should have learned from the first time.[157] But the testimony showed that he was hungry, and a hungry child of normal or slightly below normal intelligence could also ignore the risk of getting sick because of the immediate need for food. The habeas court found that Applicant did not have a driver's license and had never learned to drive.[158] That is a factor to consider, but is by no means dispositive, especially given his family's poverty and his relative youth (twenty years old) prior to incarceration. The habeas *572 court also referred to Applicant being easily led, but as we explained above, those conclusions, from interested witnesses, are at odds with more objective evidence showing Applicant's ability to stand up for himself and to influence others.[159]
Some of the trial court's findings suggest that Applicant had defects in executive functioning (planning, strategizing, priority setting, and cognitive flexibility).[160] But Dr. Compton testified that the instant crime displayed Applicant's ability to plan-"[w]earing a wig, covering up the gun and going to Louisiana all indicate a level of planning and forethought and ability to appreciate the need to do something not to be apprehended."[161]
Dr. Compton testified that some of the skills that her testing showed that Applicant lacked were things that he simply had not had the opportunity to learn.[162] She had to assign zeroes to questions asking about areas for which Applicant had no exposure, such as writing a check or using a microwave oven.[163] As we explained above, Applicant displayed considerable skill with writing and math, employed in practical uses such as reading books and newspaper articles-some of which related to the claims being made in his legal proceeding-writing letters, composing or at least copying legal motions, filling out commissary slips (which required both math and writing), and playing dominoes.
We also conclude that Applicant's low scores on adaptive skills testing, in the practical area or otherwise, lack reliability, not only because of the skewing effect of Applicant's lack of exposure to certain skills, but also due to lack of effort or malingering on Applicant's part in taking the tests. We view with extreme skepticism one test resulting in the lowest score the examiner has ever recorded.[164] Applicant made exceedingly low scores on some IQ tests, such as a score of 57, that are inconsistent with scores on other tests that are in the 70s or even higher,[165] and he made inconsistent scores in the mathematical portions of one of the recent tests he had taken.[166] Dr. Compton noted that various testing she conducted suggested that Applicant was exerting suboptimal effort.[167] On an information subtest that asks general knowledge questions, Applicant stated that he did not know what a "thermometer" was, but he was able to describe what a thermometer was on a test he took in 1989.[168] Dr. Compton testified that memory of the meaning of such a word is "crystallized knowledge" and that it is "rare to just forget it and not know what it *573 is."[169] Dr. Compton explained that that response caused her concern: "I found that disturbing. I'll be honest with you, I did."
C. Conclusion
After reviewing the case under the standards set forth in the DSM-5, we conclude that Applicant has failed to show adaptive deficits sufficient to support a diagnosis of intellectual disability.[170] Consequently, we deny relief.
Alcala, J., filed a dissenting opinion in which Richardson and Walker, JJ., joined.
Newell, J., did not participate.
DISSENTING OPINION
Alcala, J., filed a dissenting opinion in which Richardson and Walker, JJ., joined.
The sole issue in this case is whether Bobby James Moore, applicant, has established that he is intellectually disabled such that his execution for capital murder would be prohibited by the Eighth Amendment to the federal Constitution. I conclude that, under current medical standards described in the Diagnostic and Statistical Manual of Mental Disorders[1] and the manual of the American Association on Intellectual and Developmental Disabilities,[2] applicant has met his burden to show that he is intellectually disabled. He is, therefore, categorically exempt from the death penalty because his execution would violate the Eighth Amendment's prohibition on cruel and unusual punishment. See Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[3] I'm in good company in reaching this conclusion. The State's prosecutor has agreed with this conclusion in his brief to this Court.[4] The habeas court that considered the live testimony of the expert witnesses has recommended that this Court grant applicant relief on the basis of this conclusion. In its opinion reviewing this Court's prior decision in this case, the Supreme Court in Moore v. Texas , --- U.S. ----, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017), also made numerous observations indicative of its view that it too agrees with the conclusion that applicant is intellectually disabled such that his execution would violate the Eighth Amendment.[5] And this Court has *574 received six amici curiae briefs from various individuals and groups, some of whom are mental health experts and capital punishment experts, all also opining that applicant is intellectually disabled. There is only one outlier in this group that concludes that applicant is ineligible for execution due to his intellectual disability, but unfortunately for applicant, at this juncture, it is the only one that matters. Today, in solitude, a majority of this Court holds that applicant is not intellectually disabled, and it denies his application for habeas relief. I respectfully disagree with this Court's analysis and its ultimate decision to deny applicant relief.
Although this Court is correct in its overall position that Texas courts must consult and be informed by current medical standards as reflected in the DSM-5 and AAIDD-11 manuals in evaluating whether a person is intellectually disabled, this Court's majority opinion does not accurately set forth the detailed substance of those clinical standards, and then the majority opinion further errs in its application of those standards to the facts of this case. Specifically, in rejecting applicant's intellectual disability claim on the basis that he has failed to establish deficits in his adaptive functioning, this Court's majority opinion makes five critical mistakes. First, it implicitly suggests that it is not enough for applicant to show that he has adaptive deficits in one of three adaptive-skills domains, instead focusing on applicant's strengths in the other two domains for which deficits need not be shown for him to qualify for a diagnosis of intellectual disability. Second, relatedly, it suggests that it is proper to weigh applicant's adaptive strengths against his adaptive weaknesses to find that he is not intellectually disabled. But this is not an accurate approach under current medical standards. Third, it gives considerable weight to evidence of applicant's adaptive strengths in the controlled environment of death row, but according to clinical standards, that type of evidence should be given limited weight. Fourth, it fails to defer to the habeas court's determination on the credibility of the expert witnesses who opined that applicant meets the clinical requirements for a diagnosis of intellectual disability. Fifth, by imposing a heightened burden for establishing adaptive deficits, it essentially continues to determine that mildly intellectually disabled people are subject to the death penalty in contravention of the Supreme Court's holding in Moore .
In contrast to the majority opinion's flawed approach, I would set forth a comprehensive standard for evaluating intellectual disability in a manner that fully comports with current medical standards. Specifically, with respect to the adaptive functioning inquiry that is at issue in this case, I would hold that that inquiry may not place undue emphasis on a person's adaptive strengths as a basis for offsetting clear evidence of his deficits; it may not place undue weight on a person's behavior while incarcerated; and it may not impose a heightened burden for establishing adaptive deficits that essentially operates to permit the execution of mildly intellectually *575 disabled people. Applying the proper standard to applicant's case, I would defer to the habeas court's findings of fact and conclusions of law that correctly determined that applicant has established deficits in his adaptive functioning so as to warrant a determination that he is intellectually disabled and thus exempt from the death penalty. Because I conclude that the majority's analysis fails to comport with current medical standards, the Supreme Court's holding in Moore , and ultimately, the requirements of the Eighth Amendment, I respectfully dissent.
I. Background
To fully understand the current posture of the instant habeas proceedings, it is necessary to review the previous state and federal litigation concerning applicant's intellectual disability claim. I will address each in turn.
A. The State Litigation
Nearly forty years ago, in 1980, applicant was convicted of capital murder and sentenced to death. The facts underlying applicant's offense show that, while robbing a store along with two others, applicant shot one of the store clerks with a shotgun, killing him.[6] After applicant's conviction and sentence were affirmed by this Court on direct appeal, he later sought federal habeas relief on the basis of ineffective assistance of counsel. In 1999, the federal habeas court granted him relief as to the punishment phase only.[7] Applicant subsequently received a new punishment trial, after which he was again sentenced to death. In 2004, applicant's new death sentence was affirmed by this Court on direct appeal.[8] Following that decision, applicant filed the instant application for a post-conviction writ of habeas corpus that is the subject of the current litigation.
Applicant's habeas application contends that he is categorically exempt from the death penalty due to his intellectual disability. Addressing this claim, the habeas court held a two-day evidentiary hearing at which four expert witnesses and several lay witnesses testified. Applicant presented the testimony of three expert witnesses, two of whom had examined him and determined that he meets the current clinical criteria for a diagnosis of intellectual disability; the third expert did not directly examine applicant but opined that his behavior is consistent with intellectual disability. To support their conclusions, applicant's experts cited evidence showing that, throughout his youth, applicant exhibited signs of developmental delays. One expert, Dr. Borda, observed that, even at the age of thirteen, applicant's academic records reflected that he lacked a basic understanding of simple concepts such as measurements, telling time, days of the week, or seasons. Dr. Borda additionally noted that applicant's history of being physically abused at home and suffering from malnutrition could have contributed to his intellectual disability. Another expert, Dr. Anderson, concluded after conducting extensive testing that applicant has a substantially limited ability to perform basic math computations, severely impaired verbal memory skills, and deficiencies in cognitive processing speed. In contrast to applicant's defense experts, one expert, the *576 State's expert, Dr. Compton, determined that applicant was in the "borderline" range of intellectual functioning rather than intellectually disabled. Although the results of her tests were consistent with the defense experts' conclusions that applicant exhibited subaverage general intellectual functioning, Dr. Compton determined that he was not intellectually disabled based on her assessment of the totality of his perceived adaptive skills.
After the culmination of the hearing, the habeas court made findings of fact and conclusions of law recommending that relief be granted. In reaching its decision, the habeas court relied upon current medical diagnostic standards as set forth in both the DSM-5 and the AAIDD-11 manuals. By applying these standards, the habeas court determined that applicant had demonstrated sub-average general intellectual functioning, noting that the average of his IQ scores across several testing instruments was 70.66, which is within the range of mild intellectual disability by applying the standard error of measurement of five points. The habeas court further determined, based on the testimony of applicant's experts, that applicant had presented evidence of significant deficits or limitations in his adaptive functioning. The habeas court recommended that applicant's death sentence either be reformed to a sentence of life imprisonment, or, alternatively, that he be granted a new trial on intellectual disability.
In a split decision, this Court rejected the habeas court's recommendation and denied relief. See Ex parte Moore , 470 S.W.3d 481, 527 (Tex. Crim. App. 2015) ; see also id. at 528 (Alcala, J., dissenting). This Court's majority opinion held that applicant was not intellectually disabled by applying this Court's 2004 precedent in Ex parte Briseno , 135 S.W.3d 1 (Tex. Crim. App. 2004), in which this Court had held that certain non-clinical "evidentiary factors" could be used to evaluate a claim of intellectual disability.[9] Because the habeas court had declined to apply the Briseno framework, this Court's majority opinion rejected its recommendation to grant habeas relief. Moore , 470 S.W.3d at 527-28. Furthermore, this Court's majority opinion explained that the habeas judge had erred by applying current medical-diagnostic standards from the DSM-5 and AAIDD-11 to applicant's claim, when this Court's precedent in Briseno instead required adherence to the 1992 definition of intellectual *577 disability stated in the ninth edition of the American Association on Mental Retardation (AAMR) manual and the similar definition of intellectual disability contained in section 591.003(13) of the Texas Health and Safety Code. Id. at 486.[10] Applying the Briseno standard to the facts of applicant's case, this Court concluded that the evidence failed to show that he had met any of the three prongs for a diagnosis of intellectual disability. Id. at 519, 525-28.
With respect to the first prong, subaverage general intellectual functioning, this Court determined that applicant's range of reliable IQ scores from two testing instruments was between 69 and 83. Id. at 519. Although a score of 69 falls within the range that is recognized by medical professionals as indicating subaverage general intellectual functioning, this Court nevertheless concluded that applicant had failed to meet that prong of the inquiry. Id. In reaching that conclusion, this Court explained its view that applicant's true IQ score was in fact in the higher end of this range, given that, during the developmental period, he had been traumatized by family violence, he came from an impoverished and minority cultural background, and he had a history of drug abuse and academic failure. Id. The Court also observed that, when he scored a 74 on the WAIS-R at age 30, applicant was already on death row and had exhibited withdrawn and depressive behavior. Id. In view of these subjective considerations, the Court determined that applicant's IQ score was beyond the range for intellectual disability. Id.
Turning to the adaptive functioning prong, the Court similarly concluded that applicant had failed to demonstrate that he had "significant and related" limitations in adaptive functioning. Id. at 520. To meet this requirement, the Court explained, a defendant would be required to show a score of at least two standard deviations below either (1) the mean in one of the three adaptive behavior skills areas or (2) the overall score on a standardized measure of conceptual, social, and practical skills. Id. at 488. And he would also be required to show that his adaptive behavior deficits were "related to" his significantly sub-average general intellectual functioning, rather than some other cause, such as a personality disorder. Id. The Court held that applicant had failed to meet these requirements by relying on the opinion of Dr. Compton, while discounting the opinions of the other experts who had found that he did have significant adaptive deficits. Id. at 524-25. This Court's majority opinion explained its holding with four particular reasons that I discuss next.
First, this Court was persuaded by Dr. Compton's opinion that applicant's adaptive strengths outweighed his adaptive deficits. This Court observed that, even if Dr. Compton's testimony established that applicant had some limitations in academic and social-interaction skills during the developmental period, his level of adaptive functioning had been "too great, even before he went to prison," to *578 support an intellectual-disability diagnosis. Id. at 526.
Second, this Court considered applicant's improved behavior and functioning in prison as a means to offset a determination that he had adaptive deficits. For example, the Court cited the fact that he had learned to read and write in prison; he had written letters to various individuals; and he was found to have newspapers and books in his cell. Id. at 522-24, 526. Based on these observations, the Court determined that applicant had made "significant advances ... while confined on death row." Id. at 526.
Third, even assuming that applicant had shown some evidence of adaptive deficits, this Court reasoned that those deficits were not sufficiently "linked to" his subaverage general intellectual functioning but were instead attributable to causes other than intellectual disability. Id. The Court observed that the record "overwhelmingly supports" the conclusion that applicant's social and academic difficulties were "caused by" a variety of other factors, such as trauma from his abusive and unstable home life as a child, a possible undiagnosed learning disorder, social and academic problems in school, or drug use. Id.
Fourth, this Court cited the Briseno evidentiary factors to explain its conclusion that applicant's evidence failed to show that any deficits in his adaptive functioning were directly related to his subaverage general intellectual functioning. Id. Applying the seven factors, the Court observed that (factor 1) no testimony showed that those who knew applicant during the developmental period thought he was intellectually disabled, and applicant had never been formally diagnosed as intellectually disabled as a child; (factor 2) the evidence showed that applicant had "formulated plans and carried them through," including his attempts at earning money as a child so that he could buy food for himself and his siblings when they were hungry, his presentation of an alibi defense at trial, and his involvement in various aspects of his legal proceedings; (factor 3) applicant's prison disciplinary records demonstrated "leadership"; (factors 4 and 5) the record showed that applicant responds rationally and appropriately to external stimuli and responds coherently, rationally, and on point to oral or written questions, given the "many instances" in the record of applicant's testimony and interactions with courts over the course of this case; and (factors 6 and 7) applicant's varying statements to police about the offense and the facts of the offense itself show that he can hide facts or lie effectively in his own interest and undertake activities requiring forethought, planning, and moderately complex execution of purpose. Id. at 526-27.
Having determined that applicant failed to show either subaverage general intellectual functioning or significant deficits in adaptive functioning, this Court summarily determined that he had not met the third prong of the inquiry, onset of intellectual disability prior to the age of eighteen. Id. at 527. The Court rejected applicant's claim by concluding that applicant is a "person capable of functioning adequately in his everyday world with intellectual understanding and moral appreciation of his behavior," and, thus, he failed to show that he was exempt from execution under the Eighth Amendment. Id.
B. The Federal Litigation
Subsequent to this Court's former decision in this case, applicant sought a writ of certiorari in the Supreme Court, which was granted. The Supreme Court vacated this Court's judgment and remanded the case to this Court for further proceedings. Moore , 137 S.Ct. at 1053. The Supreme Court addressed four topics to resolve the *579 case; it was unanimous on one and split as to the other three.
First, the unanimous Supreme Court held that this Court had erred by using the Briseno evidentiary factors to evaluate intellectual disability in a manner that conflicted with the requirements of the Eighth Amendment and Supreme Court precedent. Id. at 1051. The Supreme Court's majority opinion observed that the Briseno factors were not aligned with the medical community's information and thus, "[b]y design and in operation, the Briseno factors 'creat[e] an unacceptable risk that persons with intellectual disability will be executed.' " Id. (quoting Hall v. Florida , --- U.S. ----, 134 S.Ct. 1986, 1990, 188 L.Ed.2d 1007 (2014) ). By resorting to lay perceptions and stereotypes to determine whether a person is intellectually disabled, this Court's approach deviated not only from clinical practice but also from the practices of other states in handling intellectual-disability claims. Id. at 1052. The Supreme Court ruled that, going forward, the Briseno factors "may not be used, as [this Court] used them, to restrict qualification of an individual as intellectually disabled." Id. at 1044, 1052.
Second, a majority of the Supreme Court held that the determination of whether someone is intellectually disabled should be " 'informed by the views of medical experts' " and guided by the " 'medical community's diagnostic framework.' " Id. at 1044, 1048 (quoting Hall , 134 S.Ct. at 2000 ). The Court explained that in its decision in Hall , it had rejected Florida's practice of using a strict IQ-score cutoff to reject claims of intellectual disability, and it explained that that decision clarified that states have limited discretion in determining how to enforce the restriction on executing the intellectually disabled. Id. at 1048 (citing Hall , 134 S.Ct. at 1998 ). Citing Hall , the Moore majority stated, "Even if 'the views of medical experts' do not 'dictate' a court's intellectual-disability determination ... the determination must be 'informed by the medical community's diagnostic framework.' " Id. (quoting Hall , 134 S.Ct. at 2000 ). The Court further observed that, in Hall , it had relied on "the most recent (and still current) versions of the leading diagnostic manuals-the DSM-5 and AAIDD-11." Id. ; see Hall , 134 S.Ct. at 1991, 1993-95, 2000-2001. In explaining the basis for its holding in Hall , the Court indicated that the flaw in Florida's approach was that it had disregarded " 'established medical practice' " and parted ways with practices and trends in other States. Moore , 137 S.Ct. at 1049 (quoting Hall , 134 S.Ct. at 1995 ). Relying on Hall , the Court in Moore stated that "being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards." Id.
Third, a majority of the Supreme Court clarified that Atkins 's prohibition on the execution of intellectually disabled offenders extends to any person who meets the clinical diagnostic criteria for intellectual disability, and this includes a categorical prohibition against the imposition of the death penalty even against mildly intellectually disabled people. Id. at 1051. The Briseno Court had been wrong, the majority explained, to suggest that individuals with mild intellectual disability might be eligible for execution in Texas, so long as a consensus of Texas citizens agreed that such a practice was permissible. Id. Rejecting this reasoning, the Supreme Court stated, "Mild levels of intellectual disability ... nevertheless remain intellectual disabilities, and States may not execute anyone in 'the entire category of [intellectually disabled] offenders.' " Id. (citing Hall , 134 S.Ct. at 1998-99 ; Atkins , 536 U.S. at 308 and n.3, 122 S.Ct. 2242 ; and quoting *580 Roper v. Simmons , 543 U.S. 551, 563, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ).
Fourth, the Moore majority specifically explained the various ways in which this Court's majority opinion had erred in its analysis of two of the prongs for deciding whether applicant was intellectually disabled by applying reasoning that was incompatible with current medical principles. With respect to this Court's analysis of applicant's general intellectual functioning, the Supreme Court rejected this Court's determination that applicant's two IQ scores that it deemed reliable-a 74 and a 78-were alone a sufficient basis upon which to reject his claim of intellectual disability. Id. at 1049-50. The Supreme Court explained that, contrary to this Court's analysis, clinical standards would require the application of the standard error of measurement of five points, and thus applicant's correct range of scores, adjusted accordingly, would yield an IQ score range of 69 to 79. Id. at 1049 (citing Hall , 134 S.Ct. at 1995 ; DSM-5, at 37; AAIDD, User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports 22-23 (11th ed. 2012) ). Because the low end of applicant's range of IQ scores fell below a score of 70, which is generally accepted in the clinical community as the dividing line for establishing subaverage general intellectual functioning, the Supreme Court indicated that it was improper for this Court to reject his claim on the basis of his IQ score alone. Rather, the Supreme Court explained that, when the low end of a person's range of IQ scores falls "within the clinically established range for intellectual-functioning deficits," clinical standards require that a court must continue the inquiry and consider other evidence of intellectual disability, namely, evidence of adaptive deficits. Id. at 1050. Thus, the Supreme Court held that applicant had adequately established the first prong and that the outcome of the case would depend on the evidence on the second prong, which, if proven, would also establish the third prong in this case.[11]
Regarding the second prong addressing evidence of adaptive deficits, the Court observed that this Court's analysis was incompatible with clinical standards in numerous respects. This Court's analysis of the evidence had "overemphasized Moore's perceived adaptive strengths," including evidence that he had lived on the streets, mowed lawns, or played pool for money. Id. at 1050. The Moore majority explained that it was improper for this Court to rely upon evidence of applicant's perceived adaptive strengths as a basis to "overcome the considerable objective evidence of Moore's adaptive deficits[.]" Id. By doing so, this Court's analysis had deviated from the clinical standards because "the medical community focuses the adaptive-functioning inquiry on adaptive deficits," not on strengths. Id. (citing AAIDD-11, at 47 *581 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits) ).[12] Next, the Supreme Court criticized this Court's focus on applicant's improved behavior and functioning while in prison. The Court noted that reliance on this type of evidence to reject a claim of intellectual disability was flawed, given that "clinicians [ ] caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." Id. (quoting DSM-5, at 38) ("Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained."); AAIDD-11 User's Guide 20 (counseling against reliance on "behavior in jail or prison") ). Additionally, the Supreme Court criticized this Court's assessment that applicant's record of academic failure, along with the childhood abuse and suffering he had endured, detracted from a determination that his intellectual and adaptive deficits were "related." Id. at 1051. The Supreme Court explained that such experiences "count in the medical community as 'risk factors' for intellectual disability" which would prompt a clinician to further explore the prospect of intellectual disability, rather than operate to foreclose a diagnosis. Id. (citing AAIDD-11, at 59-60). This Court's use of such considerations to speculate regarding possible causes for applicant's adaptive deficits other than subaverage general intellectual functioning, and ultimately, to reject a finding of adaptive deficits, was thus out of sync with clinical standards. Id. Furthermore, the Supreme Court reasoned that this Court had also "departed from clinical practice" by requiring applicant to show that his adaptive deficits were not related to a personality disorder. Id. This error, the Court explained, was also incompatible with clinical standards because mental-health professionals recognize that "many intellectually disabled people also have other mental or physical impairments, for example, attention-deficit/hyperactivity disorder, depressive and bipolar disorders, and autism." Id. (citing DSM-5, at 40) ("[c]o-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy ) three to four times higher than in the general population"); AAIDD-11, at 58-63). The Court instructed that "[t]he existence of a personality disorder or mental-health issue, in short, is not evidence that a person does not also have intellectual disability." Id. (quotation marks and citation omitted).
In view of all these considerations, the Moore majority rejected this Court's former approach to evaluating claims of intellectual disability, and it held that this Court had erred by applying this constitutionally flawed standard to applicant's case. The Supreme Court concluded, "By rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in Briseno , including the wholly nonclinical Briseno factors, the CCA failed adequately to inform itself of the 'medical community's diagnostic framework.' " Id. at 1053. In view of the many *582 specific errors that it had identified in this Court's analysis, including this Court's use of the Briseno factors which had "pervasively infected" this Court's analysis, the Supreme Court vacated this Court's judgment rejecting applicant's intellectual-disability claim, and it remanded the case "for further proceedings not inconsistent with this opinion." Id.
II. Analysis
As explained above, given that the Supreme Court has already expressly determined the first and third prongs of the criteria for establishing intellectual disability in applicant's favor, the only remaining matter for this Court to determine is the second prong, so that is the primary focus of the remainder of this opinion. There are two important questions for this Court to determine in this case to resolve whether applicant should prevail as to the second prong addressing adaptive behavior deficits. First, now that the Briseno framework must be abandoned, what is the proper standard for deciding whether adaptive deficits have been proven? Second, has applicant shown that he meets the requirements for establishing adaptive deficits under that correct standard? As to the first question, I agree with this Court's majority opinion to the extent that it holds that the Texas standard for evaluating deficits in adaptive functioning must be adequately informed by, and may not substantially deviate from, the current medical standards for diagnosing intellectual disability as set forth in the current versions of the DSM and AAIDD manuals. I, however, disagree with this Court's majority opinion's description of the specific criteria in the current diagnostic framework applicable to the assessment of adaptive functioning as described by those sources. As to the second question regarding the application of the proper standard to the facts of this case, I agree with all of the parties involved in this case that applicant has met the requirements for establishing deficits in his adaptive functioning, and thus he has shown that he is intellectually disabled under prevailing clinical standards. I explore each of my conclusions in more detail below.
A. The DSM-5 and AAIDD-11 Set Forth General Requirements that Make Up the Proper Standard for Evaluating Intellectual Disability
This Court's majority opinion holds that intellectual disability must be determined by consultation of the standards set forth in the DSM-5 and the AAIDD-11, but in the event of a conflict between the two sources, then the DSM-5 will control. Because it is highly unlikely that there will be a conflict between these two sources which are largely overlapping and consistent, this Court's general holding as to the proper standard governing intellectual disability determinations is correct. Although the DSM-5 and the AAIDD-11 utilize different terminology in several areas, they are widely recognized as being complementary sources, rather than two competing systems for evaluating intellectual disability.[13] Thus, there is nothing inconsistent or incompatible about utilizing both sources interchangeably. The two manuals, although somewhat different in terms of scope and *583 focus, both set forth the same three essential criteria for a diagnosis of intellectual disability: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean-i.e., a score of roughly 70-adjusted for the standard error of measurement), (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances), and (3) the onset of these deficits while still a minor. See Moore , 137 S.Ct. at 1045 (citing AAIDD-11, at 1, 27; Hall , 134 S.Ct. at 1994 ).[14]
By citing both the DSM-5 and the AAIDD-11 interchangeably in recent decisions, the Supreme Court has recognized that both sources are widely accepted and reflective of the medical community's general three-prong framework for diagnosing intellectual disability. See Moore , 137 S.Ct. at 1048 (describing both sources as constituting "leading diagnostic manuals"); see also Hall , 134 S.Ct. at 1995, 2000 (citing both manuals in support of its analysis of the general intellectual functioning prong). In view of the Supreme Court's endorsement of both manuals as being medically valid sources, I conclude that it is proper to permit experts to rely upon both manuals in providing expert testimony in Atkins cases.
Because this Court's majority opinion essentially makes this same determination, its acceptance of the DSM-5 and AAIDD-11 as valid sources and its general description of the three prongs of an intellectual disability diagnosis are correct. However, because the majority opinion's description of the particular manner in which the adaptive deficits prong should be analyzed fails to conform to current medical standards, I turn to that matter next.[15]
B. The Majority Opinion Errs in its Description of the Adaptive Functioning Prong
As I will explain further below, I disagree that this Court's majority opinion accurately sets forth the proper specific framework for evaluating deficits in adaptive functioning. I will review the standard that I view as being compliant with current medical standards, and then I will explain the various ways in which this Court's majority opinion fails to fully incorporate those standards into its analysis.
1. Proper Manner of Evaluating Deficits in Adaptive Functioning
According to the DSM-5, the adaptive functioning prong is met when at least one *584 domain of adaptive functioning-conceptual, social, or practical-is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. DSM-5, at 38. The adaptive deficits prong considers how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. DSM-5, at 37; see AAIDD-11, at 15, 43 ("Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives."). Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community. DSM-5, at 33. In further discussing the adaptive behavior prong, I turn to the specifics of the three skill domains that apply to this assessment, and then I address some particular considerations that are essential to an assessment of adaptive behavior but which the majority opinion has failed to adequately incorporate into its standard.[16]
a. The Conceptual Domain
The conceptual domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. DSM-5, at 37; see AAIDD-11, at 44 (conceptual skills include "language, reading and writing; and money, time, and number concepts").
For those with mild intellectual disability, the DSM-5 provides that impairments in the conceptual domain may manifest as difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. DSM-5, at 34 (Table 1). Abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short term memory, as well as functional use of academic skills (e.g., reading, money management) may be impaired. Id.
b. The Social Domain
The social domain involves awareness of other people's thoughts and feelings; empathy; communication skills; relationship abilities; and social judgment, among others. DSM-5, at 37; see AAIDD-11, at 44 (social skills consist of interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving).
In the social domain, mildly intellectually disabled individuals may be immature in social interactions as compared with typically developing age-mates. DSM-5, at 34 (Table 1). For example, there may be difficulty in accurately perceiving peers' social cues, and communication skills are more concrete or immature than expected for age. Id. There may be difficulties in regulating *585 emotion and behavior in an age-appropriate manner, and the person may have limited understanding of risk in social situations, making him vulnerable to being manipulated by others (gullibility). Id.
c. The Practical Domain
The practical domain involves learning and self-management across various life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. DSM-5, at 37; see AAIDD-11, at 44 (practical skills involve activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone).
In the practical domain, a person with mild intellectual disability may function age-appropriately in personal care, but individuals need some support with complex daily living tasks in comparison to peers. DSM-5, at 34 (Table 1). Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. Id. Such individuals may succeed in job settings that do not emphasize conceptual skills. Id. Individuals generally need support to make health care and legal decisions and to learn a skilled vocation competently. Id. Support is typically needed to raise a family. Id.
2. The Specifics Underlying the Proper Substantive Standard for Evaluating Adaptive Functioning as Compared to the Majority Opinion's Unconstitutional Approach
I part with this Court's majority opinion in its description of the legal standard because it fails to accurately describe the specific requirements of the diagnostic framework for evaluating adaptive functioning. I conclude that, for that reason, this Court has set forth an unconstitutional standard for intellectual disability that continues to permit consideration of wholly subjective, non-clinical factors and stereotypes about intellectually disabled people that lack any basis in the medical criteria. Ultimately, although this Court suggests that it is setting forth a legal standard that adheres to the current medical framework in the DSM-5 and AAIDD-11, in actuality, it is modifying that medical criteria to omit or distort at least five of the current framework's many requirements. As a result, this Court continues to apply a standard that fails to adequately incorporate current medical standards in conflict with the Supreme Court's holding in Moore . I will discuss each of the flaws in the majority's standard below by addressing the following clinical principles that pertain to an assessment of adaptive functioning: (1) adaptive strengths may co-exist with deficits, (2) the focus for assessment of adaptive functioning is on a person's typical rather than optimal performance, (3) the proper assessment of the "directly related" association between adaptive deficits and intellectual functioning does not require proof of a causal link, (4) information obtained within controlled settings should be corroborated and should not be heavily relied upon, and (5) use of standardized measures is key to the overall assessment of adaptive functioning.
a. Adaptive Strengths
This Court's majority opinion fails to expressly recognize that clinical standards require that an assessment of adaptive functioning should not focus on a person's perceived adaptive strengths, but should instead focus on evidence of a person's deficits. As the AAIDD-11 states, adaptive skill limitations often coexist with strengths in other adaptive skill areas;
*586 thus, in the process of diagnosing intellectual disability, "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." See AAIDD-11, at 16, 45, 47. Because individuals "may have capabilities and strengths that are independent of their [intellectual disability]," it is improper to focus on a person's strengths as a basis for discounting significant evidence of limitations. Id. at 7 (explaining that intellectually disabled people may have "strengths in social or physical capabilities, some adaptive skill areas, or one aspect of an adaptive skill in which they otherwise show an overall limitation"). The Supreme Court emphasized this point in its Moore analysis, but this Court's majority opinion fails to mention this principle in describing the relevant standard for evaluating adaptive deficits. See Moore , 137 S.Ct. at 1050 (criticizing this Court's former analysis as overemphasizing applicant's "perceived adaptive strengths," and observing that the medical community "focuses the adaptive-functioning inquiry on adaptive deficits, " not on strengths).[17] By failing to incorporate this key principle into the standard for evaluating adaptive deficits, the majority opinion appears to hold that it is permissible to focus on a defendant's perceived adaptive strengths rather than focusing primarily on his limitations, thereby deviating from the clinical framework.
b. Typical Performance
The majority's recitation of the standard further errs by failing to recognize that an assessment of adaptive behavior is based on an individual's typical performance, not his maximum or atypical performance. AAIDD-11, at 16, 47 ("The assessment of adaptive behavior focuses on the individual's typical performance and not their best or assumed ability or maximum performance. Thus, what the person typically does, rather than what the individual can do or could do, is assessed when evaluating the individual's adaptive behavior."). By failing to incorporate this principle into the standard for evaluating adaptive deficits, the majority opinion's analysis is further flawed because it appears to permit courts to offset evidence of deficits in everyday functioning by citing evidence of a person's perceived functioning under extraordinary or unusual circumstances. This type of analysis is incompatible with clinical *587 standards.[18]
c. Directly Related
As the majority opinion correctly notes, the DSM-5 states that, to meet the adaptive deficits prong, a person's deficits in adaptive functioning must be "directly related" to the deficits in general intellectual functioning. The majority opinion also notes that the AAIDD-11 does not contain an express "relatedness" requirement, and in highlighting this distinction, it implicitly appears to suggest that the two sources are distinct in this regard. Although some have suggested that this "relatedness" requirement from the DSM-5 imposes a heightened burden for establishing adaptive deficits, clinicians have explained that this language from the DSM-5 simply reflects the requirement that the deficits are concurrent or coexisting with deficits in general intellectual functioning. Compare DSM-5, at 38, with AAIDD-11, at 49, 52.[19] But, by emphasizing this language from the DSM-5 without properly explaining its significance, this Court's majority opinion suggests that the DSM-5 requires proof of direct causation between subaverage general intellectual functioning and deficits in adaptive behavior, while excluding other possible causes for adaptive limitations. This is essentially the same flaw that the Supreme Court highlighted in Moore when it criticized this Court's analysis of the "relatedness" issue. See Moore , 137 S.Ct. at 1051. Specifically, the Supreme Court in Moore criticized this Court's assessment that applicant had failed to make this showing of "relatedness" in light of possible alternative causes for his adaptive deficits, such as his record of academic failure, a history of being abused as a child, or the possibility of a personality disorder. Id. The Moore Court explained that all of these considerations were risk factors for intellectual disability and could not reasonably be used as evidence that a person is not intellectually disabled. Id. In spite of the Supreme Court's guidance in this regard with respect *588 to the types of considerations that may not be used to reject a finding of intellectual disability due to a lack of "relatedness," this Court's majority opinion appears to persist in requiring defendants to provide affirmative proof that their deficits in adaptive functioning are caused by their subaverage general intellectual functioning and not attributable to some other cause, such as a personality disorder or a troubled upbringing.
d. Controlled Settings
Citing the DSM-5, this Court's majority opinion recognizes generally that adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers) and that if possible, corroborative information reflecting functioning outside those settings should be obtained. DSM-5, at 38. The AAIDD-11, in turn, provides that "[t]he diagnosis of [intellectual disability] is not based on the person's street smarts, behavior in jail or prison, or criminal adaptive functioning." AAIDD, User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports 20 (11th ed. 2012) ("AAIDD User's Guide").[20] The Supreme Court has interpreted these standards in conjunction as signaling that any assessment of adaptive functioning should not be heavily dependent upon evidence of a person's functioning in prison. See Moore , 137 S.Ct. at 1050 (noting that this Court had erred by stressing applicant's improved behavior while in prison, and noting that "[c]linicians [ ] caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is").[21] But, by citing this language from the DSM-5 without adequately explaining that evidence of adaptive functioning while in prison should be afforded minimal weight, this Court's majority opinion suggests that it is proper to consider this evidence as being highly relevant to the assessment of adaptive functioning. Moreover, as I will discuss further below, this Court's continued emphasis on applicant's improved adaptive functioning while incarcerated in the highly controlled environment of death row conflicts with this principle from the clinical standards and the Supreme Court's reasoning in Moore .
e. Standardized Measures
The AAIDD provides that, to support a diagnosis of intellectual disability, significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population, including people with and without disabilities. AAIDD-11, at 49; see also DSM-5, at 37 (discussing use of standardized measures to evaluate adaptive functioning). Significant limitations in adaptive behavior are shown by "performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills." AAIDD-11, at 10, 27, 47.[22] The *589 assessment instrument's standard error of measurement must be considered when interpreting the individual's obtained scores. AAIDD-11, at 48.
An adequate standardized measure of adaptive behavior consists of one that provides a robust standard score across the three domains of adaptive behavior, has current norms developed on a representative sample of the general population, and involves evaluation using multiple respondents and multiple sources of converging data. AAIDD-11, at 49-50; see also id. (Table 5.1, listing technical standards for selecting standardized assessment of adaptive behavior); id. at 54 (Table 5.2, guidelines for selecting an adaptive behavior assessment instrument). Although every effort must be made to select an instrument that is appropriate to the person being assessed, clinicians must recognize that adaptive behavior instruments are imperfect measures of personal competence. Id. at 60. Further, because there are currently no standardized measures related to credulity and gullibility, these characteristics must be considered in the clinical judgment of adaptive behavior limitations. Id. And, because individuals with mild intellectual disability are prone to a degree of bias in self-reporting their adaptive behaviors, self-reports should be interpreted with caution, and clinicians should not rely heavily on information obtained from the individual himself. Id. at 61.
Although the majority opinion briefly acknowledges that an assessment of adaptive functioning should be based on standardized measures, its recitation of the standard fails to clarify that use of standardized measures is the preferred means of evaluating adaptive behaviors under the current clinical framework. Moreover, the majority's standard fails to expressly recognize that a defendant's score on a standardized measure of adaptive functioning of two standard deviations or more below the mean in any single domain is widely considered as establishing adaptive deficits.[23] The majority's approach fails to comport with clinical standards because, under the clinical framework, the use of standardized measures is viewed as being essential to the assessment of adaptive functioning and as serving as a safeguard against wholly subjective determinations of adaptive functioning. See amicus brief of American Psychological Association, et. al ("The clinical diagnosis of deficits in adaptive functioning is not a wholly subjective assessment. In a clinical assessment of deficits in adaptive behavior, mental health professionals use standardized measures."). By failing to adequately recognize *590 the importance of standardized measures in the evaluation of adaptive functioning, this Court's majority opinion deviates from the clinical framework and appears to permit continued reliance on subjective or lay considerations to reject a finding of intellectual disability.[24]
C. Applicant's Evidence Shows that He is Intellectually Disabled
Having reviewed the proper standard for evaluating applicant's claim and the reasons why the majority's standard fails to adhere to the clinical framework, I now explain why I conclude that, in light of the prevailing clinical criteria, applicant has established that he meets the clinical requirements for a determination of intellectual disability and thus is entitled to relief from his death sentence. A close reading of the record in this case shows that applicant has established that he has significant deficits in his adaptive functioning so as to support the habeas court's determination that he is intellectually disabled under current medical standards. The majority opinion's rejection of the habeas court's recommendation here is flawed due to its numerous mistakes in applying an erroneous view of the clinical standards and due to its failure to defer to the habeas court's credibility determinations. As a result of these mistakes, this Court's majority opinion essentially repeats the same errors as in its original opinion in this case, ultimately rejecting applicant's claim by injecting nonclinical considerations into its analysis. To explain why I conclude that applicant is entitled to relief, I briefly address the standard of review for habeas applications. After that, I review the evidence that the habeas court determined was credible and supported its assessment that applicant is intellectually disabled, and then I examine the evidence that the habeas court rejected for lack of its credibility.
1. The Standard of Review Requires that this Court Defer to the Habeas Court on Matters Involving Credibility of the Witnesses
Although this Court is the ultimate fact finder in habeas cases involving the death penalty, we have repeatedly noted that we will abide by a habeas court's recommendation when it is supported by the record. See Ex parte Flores , 387 S.W.3d 626, 634 (Tex. Crim. App. 2012) ("The habeas judge is '[u]niquely situated to observe the demeanor of witnesses first-hand,' and his findings and conclusions are generally accorded great deference," unless those findings fail to resolve the disputed issues or are not supported by the record) (quoting Ex parte Reed , 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) ); see also Ex parte Navarijo , 433 S.W.3d 558, 567 (Tex. Crim. App. 2014) ("This Court ordinarily defers to the habeas court's fact findings, particularly those related to credibility and demeanor, when those findings are supported by the record.").
In analogous circumstances to the instant case, this Court has recognized the importance of deferring to the habeas court as the original factfinder, "particularly in those matters with regard to the weight and credibility of the witnesses and, in the case of expert witnesses, the level and scope of their expertise." Ex parte Van Alstyne , 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per curiam) (in intellectual disability determinations, "we have *591 typically deferred to the recommendation of the convicting court, whatever that might be"). In Van Alstyne , we noted that, based on the consideration of conflicting evidence from records from the Texas Department of Criminal Justice (TDCJ), affidavits from various experts and lay people, and an evidentiary hearing, the convicting court found that the applicant was intellectually disabled and recommended relief be granted. Id. Because that finding was supported by the record, notwithstanding competing evaluations by expert witnesses, we found "no compelling reason to reject that recommendation." Id.
In the instant case, this Court ignores this consistent principle from our precedent while failing to present any compelling reason for rejecting the habeas court's findings and conclusions. See ids="8365077" index="91" url="https://cite.case.law/sw3d/239/815/#p817">id. Contrary to this Court's determination, the habeas court's assessment that applicant is intellectually disabled has extensive support in the record. Here, the habeas court heard from four expert witnesses, found three experts' testimony credible, and disregarded the outlier opinion by Dr. Compton that, as explained below, largely relied on speculation and failed to correctly apply current medical standards. This Court, therefore, should defer to the habeas court's factual findings and conclusions in this case that determine that applicant is intellectually disabled.
2. The Record Supports the Habeas Court's Factual Findings that Applicant is Intellectually Disabled
In concluding that applicant was entitled to relief on his Atkins claim, the habeas court noted that its decision was "guided by the clinical definitions of mental retardation developed by the American Association on Intellectual and Developmental Disabilities ('AAIDD') and the American Psychiatric Association ('APA')." See Ex parte Moore , No. 314483-C (185th Dist. Ct., Harris County, Tex. Feb. 6, 2015), Findings at ¶ 58 (citing AAIDD (11th ed.); DSM-4 (4th ed.) ). The court noted, "Each organization recognizes that mental retardation is a disability characterized by (1) 'significantly subaverage' general intellectual functioning, (2) accompanied by 'related' (AAMR) or 'significant' (APA) limitations in adaptive functioning, (3) the onset of which occurs prior to the age of 18." Id. The habeas court determined that the defense's experts were "highly qualified," and it adopted their testimony that applicant had "significant deficits in adaptive functioning in the conceptual, social and practical realms that place him approximately two standard deviations below the mean in adaptive functioning." Id. at ¶ 181. Below, I detail the evidence and the habeas court's factual findings addressing testimony by applicant's experts Dr. Borda, Dr. Greenspan, Dr Anderson, and the lay witnesses. After that, I explain why the habeas court was correct to conclude that these witnesses' testimony establishes that applicant exhibits adaptive deficits.
a. The Habeas Court Determined that Dr. Borda's Opinion that Applicant is Intellectually Disabled was Credible
One of the defense experts found credible by the habeas court was Dr. Borda, a clinical neuropsychologist, who testified that applicant is intellectually disabled. Dr. Borda discussed four matters to support his conclusion that applicant had adaptive deficits meeting the medical criteria in the DSM and AAIDD for intellectual disability.
First, Dr. Borda testified that tests performed on applicant revealed that he exhibited evidence of deficient adaptive functioning. Because there was evidence suggesting that applicant had frontal lobe damage, which impacts adaptive functioning, *592 Dr. Borda administered the "Tinkertoy Test" where applicant was tasked with assembling structures from Tinkertoy pieces. Dr. Borda explained that this test "is almost a pure frontal lobe test" and measures "the ability to plan ahead ... [and] have some idea of what you want to get out of this and take pieces to get to that goal." Dr. Borda agreed that applicant's exceedingly poor performance indicated "severe impairment."[25] Dr. Borda also administered a Mini-Mental State exam that asked applicant basic questions, such as "who are you, where are we today, and what day is it," as well as asked him to remember three words. After about twenty minutes, applicant could recall only one of the three words. Dr. Borda characterized this performance as "not good." Dr. Borda noted in his report that applicant "appeared to give a good effort on all tasks."
Second, in addition to the results of testing on applicant, Dr. Borda considered other facts that supported his conclusion that applicant had adaptive deficits. Dr. Borda cited applicant's failure to seek outside intervention from neighbors or relatives for his physically and emotionally abusive family environment, instead choosing to sleep on neighborhood porches or in cars before eventually living on the street. He further cited applicant's poor academic history and noted that, by age thirteen, applicant's school had recommended daily drills on basic things such as days of the week, months of the year, seasons, standards of measure, and telling time. Dr. Borda opined that this indicates that applicant suffered profound intellectual limitations. Dr. Borda additionally noted that applicant had suffered several head traumas as well as malnutrition which could have contributed to intellectual deficiencies. The fact that applicant continued to eat from garbage cans after contracting food poisoning suggested an inability to learn from past experiences.
Third, Dr. Borda explained why he was unpersuaded that evidence purporting to show applicant's abilities in prison, evidence of his troubled upbringing, and evidence of his other strengths would serve to undermine his conclusion that applicant is intellectually disabled. Dr. Borda observed that applicant's ability to function in prison does not disprove intellectual disability. He stated,
[W]e've heard a lot of testimony today of how well [applicant] has done in the extreme structure of his current environment and to his credit, he has-has found a way to do well in that environment and to enhance his ability to do academic skills. And I don't mean to discount that in any way but, you know, it's taken him, what? [thirty] years to develop skills that normally would be done in elementary school. So, although that certainly is to his credit, I don't know that that necessarily speaks to his having gotten brighter. I think he's just learned to do more tasks than he was able to do before.
Dr. Borda agreed that taking thirty years to learn to do simple addition and to write a legible letter and to read at an elementary school level "does not indicate normal intellectual functioning[.]" Moreover, the prison environment provided the opportunity for repetitive practice of basic skills, such as filling out a commissary sheet or practicing cursive lettering.
*593 Dr. Borda was unpersuaded that applicant's troubled upbringing, prior employment experience, or ability to hustle pool were factors that would negate his diagnosis. He noted that applicant's impoverished and abusive upbringing likely compounded his learning difficulties, but it did not negate a diagnosis of intellectual disability. On cross-examination, the State asked whether the fact that, as a child, applicant mowed grass for money and hustled pool suggested that he had some adaptive skills. Dr. Borda explained that applicant is not wholly without adaptive skills but rather they were "probably below average for someone of that age."
Fourth, Dr. Borda explained the inconsistency between his prior testimony and his testimony at the habeas hearing regarding his conclusion that applicant was intellectually disabled by noting that the changes to the diagnostic criteria in the DSM-5 and AAIDD-11, in conjunction with other reasons, led to his changed opinion. In his affidavit summarizing his evaluation of applicant, Dr. Borda noted that, at one point, his professional opinion was that applicant was likely only borderline intellectually disabled based on a review of applicant's IQ scores. However, under the more recent guidelines set forth in the DSM-5 and AAIDD manuals that require a lesser showing to establish deficits in adaptive functioning (requiring significant limitations in only one domain, as opposed to two) and that place a reduced emphasis on IQ scores, Dr. Borda revised his opinion and determined that applicant meets the current diagnostic criteria for intellectual disability. Dr. Borda also explained that his revised opinion was based on a more thorough review of applicant's history and the testing done by Dr. Anderson. Dr. Borda ultimately opined that, by any current standard, applicant is intellectually disabled, given that applicant "clearly had marked deficits in adaptive functioning."
b. The Habeas Court Determined that Dr. Anderson's Opinion that Applicant is Intellectually Disabled was Credible
Another defense expert was Dr. Anderson, a neuropsychologist, who also concluded that applicant was intellectually disabled under either the DSM-4 or AAIDD standard. Dr. Anderson explained that she is "a clinical psychologist by training that has specialty training in either [traumatic brain injury ] or some anomaly of the brain" and that she was retained to conduct an evaluation to determine if there was any organicity (i.e. , whether applicant was born with any sort of brain anomaly) and possible traumatic brain injury. Dr. Anderson interviewed applicant for a five-hour period during which she administered multiple tests to evaluate his intellectual abilities.[26] She testified that applicant's performance ranged from low average to significantly below average.
On some of the tests that applicant performed, applicant was in the deficit range.
*594 Dr. Anderson observed deficits in applicant's "processing speed," which "is how fast the brain fires," as well as "problems with reasoning and judgment." Based on his performance on the Trails A and Trails B tests,[27] Dr. Anderson stated that applicant's processing speed fell in "what we call a deficit range, so it's pretty low" and was "more than two standard deviations below the mean." Based on applicant's performance on the Trails A and B tests, Dr. Anderson classified applicant's processing speed as "severely deficient when compared to individuals his age." She noted in her report that this performance "suggests that [applicant] may make errors when he has to process differing and/or complex information quickly." Furthermore, Dr. Anderson administered selected Delis-Kaplan Executive Functioning System (DKEFS) subtests[28] to assess several areas of applicant's executive functioning abilities. She testified that executive functioning concerns higher order learning and frontal lobe judgment, reasoning, and more abstract thought. In her report, she noted that applicant demonstrated great difficulty on higher order tasks such as reasoning and verbal fluency. Although able to complete the tests, applicant scored in the deficient range and his scores were "indicative of deficits that would require formal interventions." Dr. Anderson tested applicant's verbal memory using the California Verbal Learning Test II (CVLT-II)[29] and found his performance to fall in the severely impaired range, suggesting "a reduced capacity to learn."[30]
Dr. Anderson determined that applicant had moderate to severe impairment in his ability to perform everyday mathematical computations. She administered the Wechsler Adult Intelligence Test-IV (WAIS-IV) and Wide Range Achievement Test-4th Edition (WRAT-4) to determine his ability to perform mathematical computations *595 as they relate to daily functioning.[31] Applicant's scores fell at the bottom fourth percentile on the WAIS-IV, indicating moderately impaired ability, and at the bottom first percentile on the WRAT-4 (equivalent to a third grader), indicating moderate to severe impairment.
On some of the tests that he was administered, applicant performed in the borderline-moderately impaired or low-average range. Dr. Anderson noted that applicant's performance on the Symbol Digit Modalities Test (SDMT),[32] also a measure of cognitive processing speed, indicated applicant is in the borderline impaired range. Dr. Anderson administered the Rey Complex Figure Test (RCFT) and Hooper Visual Organization Test (HVOT) to evaluate applicant's visual perception and visual memory, and he scored in the borderline-moderately impaired range on the RCFT and average on the HVOT.[33] Dr. Anderson also administered the Controlled Oral Word Association (COWA) test to evaluate applicant's language abilities, and he scored in the low-average range.[34]
Dr. Anderson testified that interviews with several of applicant's family members indicated that the deficits applicant exhibited were longstanding and chronic. She further observed that the family members' accounts of applicant's developmental deficiencies in childhood comported with the deficits noted in his school records. Lastly, Dr. Anderson testified that it is possible for people with either intellectual disability or organic brain damage to improve some skills such as reading and writing. Dr. Anderson also noted that physical abilities, including the ability to play a game that requires physical dexterity such as pool, can coexist with intellectual disability or impairment.
Dr. Anderson concluded that, although he has demonstrated "some abilities as they relate to self-care, motor skills, and daily living," applicant has "equally as *596 many deficits in the adaptive domains which primarily fall under socialization, communication, and cognition." Dr. Anderson continued by observing that "there is historic information that accounts for [applicant's] intellectual, developmental, and adaptive deficits; and [this] indicates that he met full criteria for a diagnosis of mental retardation as a child." Moreover, Dr. Anderson determined that, "taking into account the records reviewed, prior intelligence test findings, and [applicant's] performance on more stratified and task-specific neuropsychological tests, he more likely than not meets full criteria for [intellectual disability]; and this clinician would be justified in assigning said diagnosis."
Dr. Anderson assessed whether applicant's performance on the administered tests represented his true abilities rather than some artificially diminished ability due to lack of effort on his part. She testified on cross-examination that "symptom validity tests" are built into the tests that she administered to applicant that evaluate whether applicant was putting forth maximum effort. When asked by the State if she felt that she had evaluated applicant for effort, Dr. Anderson answered, "Yes."[35] She noted that a layperson observing her examination of applicant would think he was "cooperative and trying to do his best" and that "they would definitely see deficits."
c. The Habeas Court Determined Dr. Greenspan's Testimony was Credible Regarding His Opinion that Applicant's Behavior is Consistent with Intellectual Disability
Another defense expert was Dr. Greenspan, a former professor of educational psychology. Although he did not directly evaluate applicant, he also concluded that applicant's behavior was consistent with being intellectually disabled. Dr. Greenspan noted that the "Tinkertoy Test" administered by Dr. Borda is a good indicator of problems with executive functioning. Dr. Greenspan explained that in all of the clinical manuals, "global incompetence is not a requirement for a diagnosis of intellectual disability, particularly in the range of mild retardation, which is, for the most part, what we're talking about with most Atkins cases." Dr. Greenspan also testified that intellectually disabled people try to "mask" their deficits by attempting "to act more competent than they are." He noted that, because "people with mild mental retardation look normal and they can carry on a conversation," it is often not obvious that a person suffers from an intellectual disability. As a general rule of thumb, Dr. Greenspan explained,
*597 [P]eople with mild intellectual disability have a mental age that doesn't really progress past [age eleven]. And when you think of what 11-year-olds can do, they can carry on a conversation, they can do addition, they can do subtraction. What they are not really able to do is deal with complex situations involving abstract reasoning. They could even drive a car but you wouldn't want to get in a car driven by an 11-year-old because they lack the judgment to deal with novel situations.
Dr. Greenspan testified that "everything I've seen is certainly congruent with a diagnosis of intellectual disability." He stated that one of the obstacles to accepting a valid diagnosis of intellectual disability is "a tendency to cherry-pick particular behaviors and say, well, in my opinion, somebody with mental retardation can't do that[.]"
d. The Habeas Court Found Credible Lay Witness Testimony Describing Facts Showing Applicant's Deficits and Was Unpersuaded by His Abilities Gained During Confinement
In addition to the expert testimony described above, applicant presented the testimony of several lay witnesses regarding his behavior during the developmental period. These witnesses were applicant's younger brother, his younger sister, and a childhood friend. The cumulative testimony of the defense's three lay witnesses provided a description of applicant as having done poorly in school, lacking in social and other skills, failing to understand television and denominations of money, and performing only simple tasks during employment. Although there was some evidence that applicant had gained limited abilities while confined, the habeas court was unpersuaded that that evidence would outweigh the other substantial evidence of his deficits in adaptive functioning.
Applicant was held back two grades and was "in the same classroom most of the time" with his younger sister. Throughout these years, applicant had "trouble reading" and "never could read well." His sister said applicant "didn't comprehend early on" as compared to the other children. He could not write his letters without his sister's help, and it took him "forever to spell 'cat.' " One of applicant's elementary school teachers "suggested that he was retarded." His sister "always" assisted him with his schoolwork and "actually did" most of his homework. When applicant was fourteen years of age, applicant's father "called him dumb" and whipped him because "he still didn't know how to read." Applicant dropped out of school, moved away from his house, and became homeless.
Socially, as a child, applicant, was easily misled, did not interact very well with people he did not know, was very shy, and "not really trusting." Sometimes, people in his neighborhood called applicant "dummy." When they played football or baseball, applicant had difficulty following instructions for the plays and he would be repeatedly admonished for "slinging" the bat towards the catcher when he hit a baseball. It was easy to take advantage of applicant, and some people tried. For example, at one point, a stranger tried to get applicant to steal a gym bag for him at a neighborhood gymnasium until applicant's friend intervened on applicant's behalf.
Applicant did have a "backbone" when he needed one and he would try to stand up for his mother when his father would beat her. Although he would try to stand up for himself when he could, applicant just "stood there" and "he wouldn't cry" while his father was "whipping him" for not knowing how to read.
*598 Regarding his capacity to grasp ordinary events that occurred when he was a child, applicant did not understand "a lot" of the television shows the children in his family watched together. He was able, however, to have manual-labor type jobs as a child, such as mowing lawns and mopping floors at a restaurant. Although he could earn some money, applicant was incapable of identifying the denominations of the cash money he earned, and "it was a long time before he actually understood the value of money."
The habeas court heard evidence that applicant had gained some abilities while confined on death row. For example, after he had been confined in prison for six years, applicant, as an adult, learned how to read and write. From prison, applicant has written letters to people and he has "nice handwriting now." A neighborhood friend believed applicant appears to be more "intelligent" as an adult than he was as a child, but he also noted that he sometimes has to reread the letters written by applicant to understand what applicant is trying to convey.
While confined, applicant has been able to obtain items from the commissary with an order form that he has numerous hours to fill out. Death row inmates generally are allowed $85 to spend on commissary each two week period. The commissary request forms describe the requested item, the number of items, and the cost for the items. Applicant's commissary forms were often substantively correct and came close to the maximum amount, suggesting that the person who filled out the form was able to do simple addition to a sum of $85. The commissary supervisor at the Polunsky Unit who testified as to these matters has been familiar with applicant for about the most recent fourteen years of applicant's confinement (applicant has been confined for almost forty years). The commissary supervisor agreed that even a first grade child at six or seven years of age could perform some of the simple addition required to fill out a commissary request by simply adding up the amounts for the requested items. He also agreed that the forms have not changed in fourteen years and that applicant had the opportunity to spend numerous hours filling out a commissary form prior to turning it in, providing plenty of time to do any required math. Also, it was unknown whether another inmate or jail guard assisted applicant in filling out the forms. The commissary supervisor believed that applicant did not appear to be unable "to understand what's going on with his commissary" and was able to respond to questions.
While confined in prison, applicant has demonstrated more aptitude than he did as a child. He has made beautiful clocks and picture frames. He filed some pro se motions, but he had also received help from jailhouse writ lawyers who assist inmates with court filings. He also testified at his former trial, but he may have extensively practiced this testimony in an effort to appear coherent. Amongst the possessions in his cell were books and court-related documents with underlinings that either he read and marked up or that someone else read and sent to him already marked up.
e. Overall, the Habeas Court's Recommendation that Applicant is Intellectually Disabled is Supported by the Record
Viewing the entirety of this evidence, including the lay witness testimony and the defense expert testimony and reports, this evidence demonstrates that, notwithstanding evidence of some limited adaptive strengths, applicant clearly exhibits significant adaptive deficits, at a minimum, in the conceptual domain under the current medical criteria. As the defense experts *599 observed, his impairment manifested as deficits in abstract thinking, executive functioning (i.e. , planning, strategizing, priority setting, and cognitive flexibility), and short-term memory. His conceptual skills lagged markedly behind those of his peers throughout the developmental period. When he was a young child, his language and pre-academic skills developed slowly. When he was in school, his progress in academics as well as related concepts such as an understanding of time and money occurred more slowly as compared to his peer group and was markedly limited compared with that of his peers. As an adult, his academic and cognitive skills are typically at an elementary level. These observations are all entirely consistent with the diagnostic criteria for establishing deficits or limitations in the conceptual domain so as to support a diagnosis of intellectual disability. See DSM-5, at 34, 37; AAIDD-11, at 43-46.
The habeas court's findings of fact that relate to applicant's conceptual adaptive deficits addressed language, reading and writing, and academics in general. The court found, based on statements from applicant's family members, that applicant "didn't know how to communicate with people," " 'could not follow simple instructions,' " and " 'had trouble verbally with people.' " The fact findings noted that applicant's father would often beat him for failing to speak because he did know how to respond. Additionally, the findings noted that applicant was "quiet" and that applicant's father "was always cruel to [applicant] for his poor grades and speech." The court found that applicant's ability to read and write was impaired. Its findings noted that applicant was unable to read or write when he left school and he "could not read the sports page." The findings further noted that applicant was kept separate from the rest of class throughout his schooling because he could not keep up with the work and was allowed to draw pictures instead of reading. The court also found that "because of [applicant's] slowness and his inability to read or write, his father would pick on him by threatening him and beating him more than any of the other children." The court noted that teaching staff who came into contact with applicant recognized that he was much slower than his peers, that he failed first grade twice, and that he was "socially promoted" to subsequent grades to be kept with similar-age peers despite repeated failures. The court noted that during the repeated year of first grade, applicant's "student records show that he was below average in his ability to respond 'promptly and willingly' to directions and it is indicated that he was not self-reliant," and he was below average in attentiveness and ability to discipline himself. After being socially promoted to fourth grade, applicant scored in the fifth percentile nationally on the Iowa Test of Basic Skills, confirming significantly below average intellectual functioning. The court observed that applicant continued to perform below average and test behind his grade level consistently until dropping out of school in the ninth grade. The court noted that, in ten years of school in special education classes, applicant received over thirty "F's," twenty five "D's," approximately fourteen "C's," five "B's," and no "A's." The court stated that, in evaluating applicant's claim, it has "placed substantial weight in [applicant's] well-documented academic limitations[.]"
The habeas court's ultimate assessment that applicant exhibited deficits in adaptive behavior that satisfy the criteria set forth in the AAIDD and DSM guidelines for intellectual disability is supported by the record. The habeas court found the experts qualified to testify about intellectual disability generally and credible as to their conclusions in this case. The defense experts *600 each agreed that, although he exhibited some adaptive strengths and improvements in certain skills, applicant is at least mildly intellectually disabled based on significant adaptive deficits in pertinent areas. There is nothing in the record to indicate that the defense experts did not adhere to the prevailing accepted medical framework for diagnosing intellectual disability or that their conclusions are inherently lacking in credibility or unreliable. Although it is true that the State presented a competing expert, the habeas court was more persuaded by the credible testimony presented by the defense experts and by the testimony of lay witness who knew applicant during the developmental phase. It is proper, therefore, for this Court to follow the recommendation of the habeas court that applicant is intellectually disabled under the current medical framework.
3. The Majority Opinion Errs By Failing to Apply Current Medical Criteria in a Constitutionally Compliant Manner and by Deferring to Dr. Compton's Opinion that Fails to Conform to the Proper Medical Criteria
In its misunderstanding of the current medical diagnostic criteria, this Court reaches an incorrect ultimate determination in this case by holding that applicant is not intellectually disabled. It reaches this mistaken conclusion by applying its newly created improper standard for deciding intellectual disability claims, and as a result, it erroneously finds Dr. Compton's testimony more persuasive than the three other experts in this case. I discuss these mistakes in turn.
a. This Court's Application of an Erroneous Standard Pervasively Infects Its Analysis of Applicant's Claim
As I have explained above, despite its contention that it is applying a new constitutionally compliant standard for evaluating adaptive deficits, this Court's majority opinion, in practice, continues to apply the essence of the Briseno standard that was flawed due to its departure from accepted scientific practices for diagnosing intellectual disability. Specifically, the majority's current approach, though purporting to reflect the standards set forth in the DSM-5, instead fails to comport with current standards because it permits the weighing of adaptive strengths against evidence of deficits; permits consideration of a defendant's optimal or atypical performance; requires a defendant to satisfy a non-clinical "relatedness" inquiry; affords undue weight to evidence of a defendant's functioning while incarcerated; and fails to afford adequate importance to the role of standardized assessments in the evaluation of adaptive behavior. I discuss these flaws in this Court's application of the law to applicant's case in greater detail below.
First, I disagree with this Court's excessive reliance on an assessment of applicant's strengths as a basis for finding that he does not have adaptive deficits. Individuals with mild intellectual disability may be able to carry out many normal tasks but nevertheless have significant deficits in one of the three domains of adaptive functioning. The majority opinion's stereotyped view of the intellectually disabled as having to be entirely non-functional people has no place in the current medical diagnostic framework. Furthermore, I disagree with the majority opinion's application of a Briseno -style subjective review in a manner that appears as if this Court is independently evaluating the quality of the adaptive deficits in a lay-person's assessment wholly apart from the medical diagnostic framework. This Court's majority opinion's approach uses a non-medical understanding of adaptive functioning to undermine *601 credible medical testimony of adaptive deficits that was shown by the defense experts. This is particularly a problem where, as here, a person who is mildly intellectually disabled has some strengths and weaknesses, even in the same domain of skills. This Court's approach of listing qualities and examining all of applicant's strengths for each quality is eerily reminiscent of the seven Briseno factors that were held to be unconstitutional by the Supreme Court.
Second, I disagree with this Court's majority opinion's emphasis on applicant's ability to survive under extreme circumstances and on his behavior in prison, when instead this Court should examine his typical behavior in a non-prison setting. For example, applicant repeatedly ate neighbors' trash when he was starving and became sick as a result, but this Court suggests that that is evidence that shows he was not intellectually disabled because someone who had borderline intellectual functioning may have done the same thing. Resorting to eating trash in an effort to respond to extreme starvation cannot fairly be considered behavior indicative of typical adaptive functioning and the majority opinion's suggestion should be wholly disregarded. Similarly, this Court observes that Dr. Compton noted that applicant "had to engage in some adaptive behavior" "in order to survive on the streets." Suggesting that applicant was not intellectually disabled because he was able to survive homeless on the streets for a period of time is hardly the type of behavior indicative of typical adaptive functioning, and it should have little to no probative value in determining whether he has adaptive deficits.
This Court's analysis is similarly flawed in its excessive focus on applicant's ability to enhance his reading, writing, math and other performance in the controlled prison setting because that evidence is suspect. Applicant had numerous hours while confined to fill out a commissary form, the same form he has seen for fourteen years, and it still contained mistakes. Furthermore, applicant could have received assistance filling out the form from other inmates or jail guards. Applicant had newspapers, books, and court documents in his cell, but someone had to send him those things and they may have been underlined or marked when applicant received them. Or applicant could have underlined and marked the things he did not understand. Applicant wrote letters that people could understand, particularly when the letter was re-read, but so do elementary-school-aged children and he had unlimited time to write and rewrite any letters he chose to send. This Court's improper focus on applicant's abilities while he is confined in prison is precisely the type of analysis that the Supreme Court cautioned against in Moore because of the excessive amount of time he has to perform simple, repetitive tasks, and the large degree of uncertainty surrounding the amount of assistance or support he received in accomplishing various tasks.
Third, I disagree with this Court's majority opinion's inclusion of language indicating that "deficits in adaptive functioning must be directly related to the intellectual impairments," without adequately explaining that clinicians do not require a causal relationship between intellectual deficits and adaptive deficits. To the extent that this Court requires applicant to present evidence that his adaptive deficiencies are directly caused by his subaverage general intellectual functioning, this Court's analysis improperly disregards the Supreme Court's description of the applicable law and imposes an additional burden of proof on applicant not required by the clinical criteria. Furthermore, in requiring a causal *602 link between an adaptive deficit and an intellectual deficit, this Court's majority opinion determines that, even if the record did support the habeas court's finding that applicant never held a real job, "there is nothing to suggest that any failure by Applicant to get a job would be related to intellectual deficits rather than to the fact that he did not need a job because he was making a living by robbing people." This is precisely the type of speculative reasoning regarding possible alternative explanations for deficits that the Supreme Court instructed this Court to avoid. Similarly, this Court's majority opinion disregards the habeas court's finding that applicant was intellectually disabled due to his repeated consumption of obviously spoiled food. The habeas court opines that applicant should have learned after he ate out of the neighbors' trash cans the first time that he would get ptomaine poisoning again if he ate out of trash cans a second time, which he did. This Court's majority opinion speculates an alternative reason other than intellectual disability by stating, "But the testimony showed that he was hungry, and a hungry child of normal or slightly below normal intelligence could also ignore the risk of getting sick because of immediate need for food." This type of speculation that reaches for alternative hypothetical explanations for an adaptive deficit for some reason other than intellectual disability is precisely what the Supreme Court instructed had been incorrectly analyzed by this Court in its prior opinion in this case. Current scientific standards do not require this type of causal link, and it is improper for this Court to use alternative hypothetical speculation to avoid finding that applicant has shown adaptive deficits.
Fourth, as I have explained above, the application of the current diagnostic framework permits mental health professionals to use standardized measures to evaluate adaptive functioning. Despite the Supreme Court's reliance on testing that was done demonstrating that applicant has adaptive deficits, this Court's majority opinion fails to mention standardized testing in its discussion of the applicable standard and in its review of the record. In Moore , the Supreme Court stated, "In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skills sets (conceptual, social, and practical)." Moore , 137 S.Ct. at 1046 (citing AAIDD-11, at 43). Here, applicant's and the State's experts agreed that applicant's adaptive functioning test scores fell more than two standard deviations below the mean in all three skill categories. Id. at 1046 (citing to App. to Pet. for Cert. 200a-201a), 1047 (citing Moore , 470 S.W.3d at 521 ). I, therefore disagree with this Court's majority opinion because I would expressly include the standardized testing criteria in the applicable standard and consider that evidence in applicant's favor in the same manner as the Supreme Court.
b. This Court Incorrectly Defers to Dr. Compton's Opinion
This Court's majority opinion determines that Dr. Compton was more credible than the defense experts regarding her suggestion that applicant probably has "borderline intellectual functioning" rather than intellectual disability. Importantly, her testing shows that applicant does have adaptive deficits and is intellectually disabled. Dr. Compton administered the Texas Functional Living Scales to assess applicant's adaptive deficits and he scored more than two standard deviations below the mean, indicating that applicant is intellectually disabled. Dr. Compton, however, unlike the other experts, disregards the result that applicant has adaptive deficits *603 under her theory that he did not put forth an adequate amount of effort and displayed adaptive strengths both before and during incarceration. For three reasons, I would defer to the habeas court's implicit assessment that Dr. Compton's conclusion is less reliable than the opposing experts' conclusions.
First, I would defer to the habeas court's implicit conclusion that Dr. Compton was mistaken in her assessment that applicant was not putting forth adequate effort to ensure results indicating intellectual disability were valid. Dr. Compton administered the Memory Malingering Test and embedded effort testing in the Advanced Clinical Solutions test to evaluate that applicant was making a genuine effort to provide valid test results. Although she determined that applicant lacked effort in taking the tests, Dr. Compton's conclusion was inconsistent with the determinations by Dr. Borda and Dr. Anderson who each indicated that applicant did exert adequate effort during their tests. Because Dr. Compton offers little support for her assessment of applicant's purported lack of effort beyond her expectation that applicant would perform better, I would defer to the habeas court's decision to disregard that conclusion. In the absence of that conclusion that applicant did not exert adequate effort, Dr. Compton's test results are consistent with the other experts' test results showing that applicant has adaptive deficits.
Second, the habeas court's implicit rejection of Dr. Compton's opinion is supported by the record because her assessment of applicant's adaptive functioning appears to be less credible than the other experts due to her heavy reliance on unsubstantiated speculative facts. There are numerous examples of her speculative assumptions about applicant's abilities to perform tasks. Dr. Compton opined that applicant had "some ability to understand money and work concepts" because he was able to "survive on the street" while homeless by hustling pool, mowing lawns, and performing simple tasks like mopping at a restaurant. Additionally, she considered his ability to play dominoes, fill out commissary slips, write letters, create court pleadings, attempts to influence others or challenge authority, and his potential skills in arithmetic, communication, and socialization. But as she largely acknowledged during cross-examination, she operated under the assumption that, because applicant attempted to engage in these activities, he was able to reasonably perform them proficiently without assistance from others. With respect to the suggestion that applicant played dominoes and that this showed he had an ability to count and to socialize with others, Dr. Compton agreed that there was no direct evidence that applicant actually played dominoes. Additionally, Dr. Compton stated that the facts of the offense, such as wearing a wig, concealing the weapon, and fleeing to Louisiana afterwards "indicated a level of planning and forethought and ability to appreciate the need to do something not to be apprehended and that relates to abstraction." But the habeas court could have reasonably disregarded this view given that very young children who misbehave also know to attempt to conceal their misbehavior and hide themselves from discovery, and there was nothing to show that applicant's efforts were overly complicated or that he was not led by others to perform these tasks. Dr. Compton noted that applicant testified during his first trial and that he was able to respond to questions posed by both the attorneys, demonstrating that he was "able to conceptualize what was being asked and form exculpatory statements or responses at times, indicating an ability to engage in abstract reasoning to some degree." But the habeas court would be well *604 aware of young children who testify responsively to questions presented by attorneys at trial so the court reasonably may have been unpersuaded by this fact. Dr. Compton also indicated that applicant had adaptive functioning because, while he has been confined in prison, he has been able to turn in commissary forms and write letters. But given that he is almost always confined to his solitary prison cell, applicant has an unlimited opportunity to spend numerous hours to undertake tasks that it might take others minutes to conduct. The record also shows that his commissary forms did have mistakes and that they required only addition like many children learn in elementary school. Additionally, applicant's letters lacked clarity and had to be re-read to be understood, and he may have repeatedly written the letters or taken an extensive amount of time to prepare them. Furthermore, he could have obtained assistance from other inmates or guards to perform these tasks. It thus appears that the events that took place in applicant's jail cell would have exceedingly limited value in assessing whether he has adaptive deficits. Similarly, Dr. Compton suggested that applicant's pro se motions, possession of court documents and books, and underline marks shown on the written materials indicate that he read and understood them. But the record does not show whether applicant merely copied his motions from form motions or whether they were legal documents prepared by a writ-writer prisoner. Furthermore, these materials and books may have been sent to him already underlined so applicant's comprehension of the materials cannot be ascertained from that fact alone.
Third, the habeas court's implicit rejection of Dr. Compton's opinion is supported by the record because her assessment of applicant's adaptive functioning appears to be unreliable due to its heavy reliance on his purported adaptive strengths. For example, Dr. Compton suggested that applicant could stand up to authority and that this was inconsistent with an adaptive deficit. But she acknowledged that instances of applicant's confrontational behavior are "not specifically indicative of anything except oppositional behavior." However, because an issue with intellectually disabled people is a failure to stand up for themselves, Dr. Compton noted that applicant's ability to stand up to authority added another "small piece of my opinion." Nonetheless, the habeas court reasonably could have determined that this "small" piece of evidence showing a minor strength had little to no probative value with respect to whether applicant had adaptive deficits within a single domain of skill sets, especially, as Dr. Compton acknowledged, without any knowledge of the context or surrounding circumstances.
Furthermore, this Court's majority opinion appears to adopt the mistaken view that any strengths exhibited by applicant disqualify him from a diagnosis of intellectual disability. This Court's majority opinion and Dr. Compton appear to focus exclusively on stereotypes about intellectually disabled people, even suggesting that such a person could not legibly copy text from one document to another document. This Court's majority opinion states, "And according to Dr. Compton, even if it were assumed that someone else composed those documents, Applicant's ability to copy such documents by hand would indicate an understanding and ability to write that would be within the realm of only a few intellectually disabled people." Dr. Compton and this Court's majority opinion suggest that someone who is intellectually disabled could not even copy words from one piece of paper onto another piece of paper. That type of stereotype of intellectually disabled people as entirely non-functional people is unsupported by the medical *605 framework and should be completely disregarded as lacking in probative value. In its amici curiae brief, the Arc of the United States and the Arc of Texas correctly observe that "there is a wide gap between the clinical definition and expectations that many laypeople have about intellectual disability."[36] The brief explains that these "[c]ommon misimpressions include beliefs that people with intellectual disability are essentially identical to one another and that all are incapable of any but the most rudimentary tasks." Furthermore, it notes that "lay assumptions sometimes include an imagined list of things that people with intellectual disability cannot achieve, such as employment, meaningful relationships, or driving a car. But the clinical literature is abundantly clear that many of the people who have been properly diagnosed with intellectual disability can perform one or more of these tasks." This view of intellectual disability was also unanimously expressed by the testifying experts at the habeas hearing.
A clinician's diagnostic focus should not center on balancing deficits against abilities or strengths that a person may also possess, but that is precisely what Dr. Compton improperly did in this case and what this Court's majority opinion defers to. In justifying her opinion that applicant did not have adaptive deficits, Dr. Compton explained that applicant "showed evidence of adaptive functioning skills during the commission of the offense and after the offense, which questions the validity of a mental retardation diagnosis." Ex parte Moore , No. 314483-C (185th Dist. Ct., Harris County, Tex. Feb. 6, 2015), Findings at ¶ 175; see also Moore , 470 S.W.3d at 522. This testimony by Dr. Compton appears to have applied the outdated Briseno analysis for adaptive functioning by weighing applicant's abilities against his deficiencies, and thus, the habeas court properly rejected her opinion. This type of weighing of strengths against deficits is precisely why this Court erred in the past and continues to err today by adhering to an expert's opinion who formed her conclusions based on an outdated standard that is counter to current diagnostic guidelines.
I conclude that the majority opinion's reliance on Dr. Compton's testimony to find, contrary to both the habeas court and the defense expert witnesses, that applicant is not intellectually disabled is incorrect. The habeas court implicitly found Dr. Compton's opinion that applicant is not intellectually disabled unpersuasive. This determination is reasonable and supported by the record. In short, two defense experts found applicant exhibited adaptive deficits sufficient to support a diagnosis of intellectual disability and a third defense expert, although not offering a diagnosis, found that applicant exhibited features consistent with the criteria for intellectual disability. The defense experts' conclusions are more reliable than Dr. Compton's assessment that was based on assumptions and her application of the Briseno -style strength-weakness balancing rather than on current medical standards alone. For all of these reasons, I disagree with this Court's analysis of applicant's claim. In my view, applicant has clearly established that he meets the definition for intellectual disability based on the views of credible experts applying the current medical criteria. The majority opinion's assessment of the evidence in this record is wholly divorced from the diagnostic criteria that it claims to adhere to, and its analysis is instead based upon numerous erroneous assumptions and reasoning.
*606 III. Conclusion
Texas should abide by the Supreme Court's holding in Moore and its admonishment to this Court to consult current medical diagnostic criteria for deciding intellectual disability claims. Unlike this Court's majority opinion, I would not deviate from the current medical framework by failing to fully incorporate the requirements of the prevailing clinical standards and by continuing to use non-clinical, subjective factors as a basis to reject applicant's claim. Applying the current diagnostic criteria to this case, it is abundantly clear that the credible experts have determined that applicant is intellectually disabled, and that determination has been endorsed by the habeas court and the parties in this case. I respectfully disagree with this Court's majority opinion's disregard of Supreme Court precedent, the current medical diagnostic criteria, and the agreed conclusion of the interested parties. I, therefore, respectfully dissent.

Briseno , 135 S.W.3d at 8-9.

See Ex parte Cathey , 451 S.W.3d 1, 11 n.23 (Tex. Crim. App. 2014) (noting change from "mental retardation" to "intellectual disability"); Ex parte Sosa , 364 S.W.3d 889, 893 n.17 (Tex. Crim. App. 2012) (noting change from AAMR to AAIDD).

Addendum Findings of Fact and Conclusions of Law on Claims 1-3 ("Findings"), paragraph 66 ("As our standards of decency evolve, so too do the standards of psychological diagnosis."). See also Moore , 470 S.W.3d at 486.

Findings, paragraphs 93-94.

Moore , 470 S.W.3d at 486-89, 514, 526-27 (citing and discussing Briseno , 135 S.W.3d at 7 & n.25, 8-9 ).

Id. at 487.

Id. at 486-87.

Id. at 518-19.

Id.

Id. at 519.

Id. at 487-88. See Findings, paragraphs 85-87.

Moore , 470 S.W.3d at 519.

Id.

Id.

Id.case-ids="6842019" index="107" url="https://cite.case.law/sw3d/470/481/#p486"> at 513.

Id. at 520.

Id. at 486. See Findings, paragraph 67 (outlining current AAIDD framework). But see ids="6842019" index="110" url="https://cite.case.law/sw3d/470/481/#p486">id. , paragraph 92 (referring to "relatedness" requirement).

Moore , 470 S.W.3d at 489.

Id.case-ids="6842019" index="112" url="https://cite.case.law/sw3d/470/481/#p486"> at 526-27.

Id. at 520-26.

Moore , 137 S.Ct. at 1049 ("The CCA's conclusion that Moore's IQ scores established that he is not intellectually disabled is irreconcilable with Hall [, --- U.S. ----, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014) ].").

Id.

Id. ("But the presence of other sources of imprecision in administering the test to a particular individual, cannot narrow the test-specific standard-error range.") (citation omitted, emphasis in original).

Id. at 1049-50.

Id.

Id. at 1050 & n.8.

Id.

Id. at 1051.

Id.

Id. at 1051-52.

Id. at 1051-53.

Id. at 1053 (Roberts, C.J., dissenting) ("I agree with the Court today that those factors [seven 'evidentiary factors' from Ex parte Briseno ] are an unacceptable method of enforcing the guarantee of Atkins , and that the CCA therefore erred in using them to analyze adaptive deficits.").

Hall v. Florida , --- U.S. ----, 134 S.Ct. 1986, 2000, 188 L.Ed.2d 1007 (2014).

137 S.Ct. at 1045 (Court's op.). See also id. at 1048, 1053.

Id. at 1052 (citing 37 TEX. ADMIN. CODE § 380.8751(e)(3) (2016) ).

Id. at 1046 n.5.

See id. at 1055 (Roberts, C.J., dissenting).

Although we specifically adopt the DSM-5, nothing in this opinion suggests that a court must reject an expert's testimony if the expert relies upon the AAIDD manual. The standards in the DSM-5 and the AAIDD manual are largely the same, with the AAIDD manual exploring the issue of intellectual disability in greater detail. Nothing in this opinion should be construed to prevent a court from relying upon portions of the AAIDD manual to the extent that they amplify or clarify standards contained in the DSM-5. But if there is a conflict between the two publications, a court must decide which to adhere to, and our decision is that, in the event of a conflict, the DSM-5 controls.

DSM-5 at 37.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id. at 38.

Id.

Id. at 34.

Id.

Id.

Id. at 38.

Id.

Moore , 470 S.W.3d at 519.

Dr. Compton testified that the IQ score of 78 on the WISC was the most reliable because it was the only full scale IQ test administered during Applicant's developmental period. See ids="6842019" index="153" url="https://cite.case.law/sw3d/470/481/#p486">id. at 517.

Id. at 524.

Id.

Id. at 524-25.

Id. at 525.

Id.

Id.case-ids="6842019" index="159" url="https://cite.case.law/sw3d/470/481/#p486"> at 506.

Id.

Id.case-ids="6842019" index="161" url="https://cite.case.law/sw3d/470/481/#p486"> at 526.

Findings, paragraphs 141, 172(d).

Id. , paragraph 142.

Id. , paragraph 153.

Id. , paragraph 158.

Moore , 470 S.W.3d at 491.

For example, at one point in the hearing on a motion to suppress his written statement, Applicant testified,
They took me to a little room and told me that I may as well sign the statement since these dudes had identified me as being with them. I told them I wouldn't. The one; so he told me I was going to make it or else it would be up to him to make this statement on whatever it called for me to make a statement.
When asked what happened at that point, Applicant stated,
Well, one officer, he told one officer to leave the room and go do something. I don't know what he went to do; but, he got to hitting me upside the jaw and everything; and I still refused to sign the statement and everything; so he took me to another room where there was some typewriters and everything and asked me would I sign. I told him, no, I wouldn't sign it.

See also Moore , 470 S.W.3d at 522.

Id.case-ids="6842019" index="167" url="https://cite.case.law/sw3d/470/481/#p486"> at 492.

Id.case-ids="6842019" index="168" url="https://cite.case.law/sw3d/470/481/#p486"> at 492, 522. Applicant did not have a lawyer to coach him for this hearing. Id. at 522.

Id. at 492. For example, Applicant read into the record a handwritten letter to his attorney that was dated February 13, 1983:
Dear sir: Through the forgoing letter, I respectfully request unto you, sir, to be notified as to whether or not have yet the Appellant's Brief was filed on February 9, 1983, or if you has requested another extension of time in which to file said brief in the above reference cause number 314483.
However, Mr. Bonner, sir, please be advised that I have filed three different motion with the court to review the record on Appeal and Prose Supplemental Brief to be considered along with your brief and the State's brief when sames are orally argued in accordance with Art. 44.33 V.A.C.C.P. and the rules of procedure of the Court of Criminal Appeals. I do not attempt to bump heads with you in any kind of way. All I wish to do is have the opportunity to defend my own life.
However, again, sir, in the above three motions that I have filed to the Court of said, I respectfully request you, sir, to enter into judge of said presence, George Walker. In the favor behalf of myself in you asking Judge of said to grant my motions. For you consideration in attending to this causing matter request will be grately appreciated as I enter your presence I enclosed three motions in this letter. I pray that you, sir, will get in touch with me as soon as possible.
(Passage as it appears in court reporter's record).

Id. at 492-93.

Id. at 493.

Id.

See also id.

Id. at 495.

Id. at 522.

Id. at 522-23. In addition, Applicant testified that a typewritten pro se brief was familiar to him as a document someone had helped him prepare and that he had a part in researching it. Id. at 497.

Id. at 501.

Id.

Id.

Id.

Id.

Id. at 510.

Id.case-ids="6842019" index="185" url="https://cite.case.law/sw3d/470/481/#p486"> at 524.

Id.

Id.

Id.

Id.

Id.

Id.case-ids="6842019" index="191" url="https://cite.case.law/sw3d/470/481/#p486"> at 502.

Id. at 509-10.

Id.case-ids="6842019" index="193" url="https://cite.case.law/sw3d/470/481/#p486"> at 510.

Id.

Id. at 513.

Id.

Id.

Findings, paragraph 169.

Id.

Moore , 470 S.W.3d at 513. On cross-examination, defense counsel had asked, "So, your price list does not change all that much, does it?" LeBlanc responded, "Oh, yes, sir, it does. Quite often."

The habeas court may have overlooked a commissary slip from 2/03/2013 that would appear to be within the spend total, regardless of whether marked-out items are included. Also, the 12/19/2012 commissary slip that the habeas court calculated as requesting $196.50 worth goods appears, by our calculations, to request only $100.50 worth of goods, if all marked-through items are included.

Examples of correct calculations include: 25 x 0.25 = 6.25, 14 x 0.80 = 11.20, 20 x 0.19 = 3.80, 15 x 1.70 = 25.50, 15 x 0.22 = 3.30.

Our conjecture is supported by the cost of the Ibuprofin. Several receipts show a request for 12 of this item, a unit price of $1.20 and a total price of $1.20. It seems to us more likely that a single Ibuprofin pill would cost ten cents than $1.20. It also seems unlikely that an inmate would order twelve pills at a time if they really cost $1.20 each.

There is at least one commissary slip in which soap was ordered when the quantity of two is marked out in favor of a quantity of ten, and the total price ($4.00) is twice the unit price ($2.00). Other slips simply order ten bars of soap where the total price is twice the unit price.

In at least some of these cases, the relative complexity of the calculation suggests that the error was not caused by a simple failure to know times-tables. For example, on the September 17, 2013 slip, Applicant specified a quantity of two peanut butter items with a unit price of $2.25 and a total price of $6.75. The correct total price was $4.50, but the price of $6.75 would be correct if Applicant had ordered three items.

See also ids="6842019" index="200" url="https://cite.case.law/sw3d/470/481/#p486">id. at 513.

Id.case-ids="6842019" index="201" url="https://cite.case.law/sw3d/470/481/#p486"> at 522.

Id. Applicant demonstrated math ability included being able to add three-digit or four-digit numbers together.

Id.

See also ids="6842019" index="204" url="https://cite.case.law/sw3d/470/481/#p486">id.

Id. at 524. In a disciplinary report, an offender who was questioned after being found in Applicant's cell stated that he was there to play dominoes. Applicant also told the defense team in May 2000 that he played dominoes with another inmate. See ids="6842019" index="206" url="https://cite.case.law/sw3d/470/481/#p486">id. at 508, 523 & n.55.

See supra at n.72 and accompanying text.

Moore , 470 S.W.3d at 494. This evaluation was done by Marcelle Tucker, M.Ed. Id.

Id. at 503.

Id.

Id.case-ids="6842019" index="211" url="https://cite.case.law/sw3d/470/481/#p486"> at 504 (brackets in the opinion)

Id.

Findings, paragraph 161(a)-(c).

Id. , paragraph 162.

Moore , 470 S.W.3d at 490, 497, 508.

See ids="6842019" index="215" url="https://cite.case.law/sw3d/470/481/#p486">id. at 523.

See ids="6842019" index="216" url="https://cite.case.law/sw3d/470/481/#p486">id. at 498-99.

Findings, paragraph 167(a)-(d).

At least twice, Applicant refused an order to shave, once saying that he had a "shaving pass" and the other time citing a medical condition. Moore , 470 S.W.3d at 498. One time, Applicant refused to get a haircut. Id. Another time, Applicant refused to sit down with a group of inmates in the day room. Id.

Findings, paragraph 167(f).

Moore , 470 S.W.3d at 497.

Id. at 522.

Findings, paragraph 172(b).

See Moore , 470 S.W.3d at 490.

Findings, paragraph 165.

See Moore , 470 S.W.3d at 523.

Findings, paragraph 166.

Id. , paragraph 164.

See supra at part B.8 (social skills).

Findings, paragraphs 132 (low score on test that included evaluating "one's ability to plan ahead"-score of "1"-the lowest Borda had ever recorded), 169(h) (concluding that Applicant lived so well in prison because it "leaves little room for independent decision-making" and that practical food, shelter, job, and bill-paying activities "would in all likelihood perplex him.").

See also Moore , 470 S.W.3d at 522.

Id. at 470 S.W.3d at 521-22.

Id. See also id. at 509 (testimony that Applicant's family did not have kitchen appliances such as a microwave oven, and meals were cooked on a hot plate).

See supra at n.160.

See Moore , 470 S.W.3d at 503, 514 (e.g. , score on Slosson test was 57, score on WAIS-IV was 59, overall score on WISC was 78, with a performance score of 83).

See supra at nn.132-34.

See Moore , 470 S.W.3d at 518 (suboptimal effort on WAIS-IV and Test of Memory Malingering).

See ids="6842019" index="232" url="https://cite.case.law/sw3d/470/481/#p486">id.

See also ids="6842019" index="233" url="https://cite.case.law/sw3d/470/481/#p486">id. at 518.

The dissent contends that our present opinion continues to employ Briseno -type factors and focuses on adaptive strengths rather than adaptive weaknesses. We disagree. We go into detail about Applicant's adaptive abilities to explain why the trial court's findings of fact are not supported by the record.

See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (2013) (hereinafter DSM-5).

See American Association on Intellectual Disability, Intellectual Disability: Definition, Classification, and Systems of Supports (2010) (hereinafter AAIDD-11).

At the time that Atkins was decided, courts used the then-prevailing term "mental retardation," but since that time, courts and clinicians now use the term "intellectual disability." I will utilize only the latter term in this opinion unless quoting prior precedent.

The State's brief concludes, "[B]ased on the findings of the habeas court, the clear import of the Supreme Court's conclusions in Moore , and our review of the applicable standards of the DSM-5, the Harris County District Attorney's Office agrees that Moore is intellectually disabled, cannot be executed, and is entitled to Atkins relief."

Although it is not expressly stated as its holding, in my view, the Supreme Court's decision in Moore has already effectively determined that applicant meets the requirements for intellectual disability so as to preclude his eligibility for execution under Atkins . See Moore v. Texas , --- U.S. ----, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017). Specifically, in Moore , the Supreme Court observed that the habeas court that recommended granting applicant relief had "consulted current medical diagnostic standards"; that applicant's IQ score would place him within the range of mild intellectual disability; and that there was "considerable" and "significant" evidence of applicant's adaptive deficits based on evidence showing that he fell "roughly two standard deviations below the mean in all three skill categories." Id. at 1045, 1046, 1050. Although I would grant applicant relief on the basis of the Supreme Court's analysis in Moore alone, I will proceed to analyze the majority opinion's analysis of the evidence of intellectual disability.

The facts underlying applicant's offense are more fully set forth in this Court's opinion affirming his conviction and sentence on direct appeal. See Moore v. State , 700 S.W.2d 193, 195 (Tex. Crim. App. 1985).

See Moore v. Collins, 1995 U.S. Dist. LEXIS 22859, *35 (S.D. Tex. Sept. 29, 1995), affirmed by Moore v. Johnson , 194 F.3d 586, 622 (5th Cir. 1999).

Moore v. State , No. 74059, 2004 WL 231323 (Tex. Crim. App. Jan. 14, 2004).

In Briseno , this Court adopted seven "evidentiary factors," purportedly to aid this Court in deciphering between those individuals who were experiencing adaptive deficits consistent with intellectual disability and those who were merely experiencing the symptoms of a personality disorder. Those factors are as follows:
• Did those who knew the person best during the developmental stage-his family, friends, teachers, employers, authorities-think he was [intellectually disabled] at that time, and, if so, act in accordance with that determination?
• Has the person formulated plans and carried them through or is his conduct impulsive?
• Does his conduct show leadership or does it show that he is led around by others?
• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
• Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
• Can the person hide facts or lie effectively in his own or others' interests?
• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?
Ex parte Briseno, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004).

The American Association on Mental Retardation (AAMR) is the former name of the American Association on Intellectual and Developmental Disabilities (AAIDD). At the time that this Court decided Briseno , the AAMR defined intellectual disability as "(1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." Briseno , 135 S.W.3d at 7. The Texas Health and Safety Code, in turn, defined intellectual disability as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." Tex. Health and Safety Code § 591.003(13).

Explaining its holding that applicant had established the first prong, the Supreme Court stated,
The CCA's conclusion that Moore's IQ scores established that he is not intellectually disabled is irreconcilable with Hall .... Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning .... [I]n line with Hall , we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits.
Moore , 137 S.Ct. at 1049-50. Furthermore, the Court observed that there was no dispute that applicant met the third prong of onset of intellectual disability during the developmental period. Id. at 1039 n. 3. According to the Supreme Court's analysis of this case, therefore, our decision today rests solely on our assessment of the second prong pertaining to adaptive functioning.

Although the Supreme Court recognized that there may be some disagreement regarding the precise role of adaptive strengths in the adaptive-functioning inquiry, such that some clinicians might consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, this Court's approach was nevertheless improper because no "clinical authority" appeared to permit "the arbitrary offsetting of deficits against unconnected strengths[.]" Moore , 137 S.Ct. at 1050 n.8.

See, e.g. , Smith v. Ryan , 813 F.3d 1175, 1209 (9th Cir. 2016) (observing that both the DSM-5 and the AAIDD-11 "retain[ ] the essential premise and characteristic of the clinical definition cited in Atkins "); Chase v. State , 171 So.3d 463, 471 (Miss. 2015) ("The [AAIDD and DSM-V definitions of intellectual disability] have not materially altered the diagnosis of intellectual disability [cited in Atkins ] but have provided new terminology."); Com. v. Hackett, 626 Pa. 567, 99 A.3d 11 (2014) (observing that a defendant seeking to establish Atkins claim may rely on the DSM or AAIDD criteria); Coleman v. State, 341 S.W.3d 221, 248 (Tenn. 2011) (describing both DSM and AAIDD as "authoritative texts"); United States v. Davis , 611 F.Supp.2d 472, 474-75 (D.Md. 2009) ("Since Atkins , other federal courts have applied these same definitions, noting that the two definitions are essentially identical.").

See also DSM-5, at 33 (defining intellectual disability generally as "a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains"); AAIDD-11, at 5 ("Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.").

Although I do not fully agree with this Court's description of the standards governing the inquiry into the first prong, subaverage general intellectual functioning, I do not address that matter in detail in this opinion, given that the Supreme Court has already decided the first prong in applicant's favor, and this Court's majority opinion accordingly does not conduct any analysis of that issue. See Moore , 137 S.Ct. at 1050. Similarly, there is no dispute that applicant has established the third prong regarding onset of intellectual disability during the developmental period. For those reasons, this case hinges on the second prong pertaining to applicant's adaptive functioning, and I limit my opinion to addressing that matter.

The DSM-5 sets forth a classification system based on severity of intellectual disability with the levels of severity ranging from mild to profound. Although classification is not essential to a diagnosis of intellectual disability, the DSM-5 system of "specifiers" assigns a severity level and provides some useful information regarding the typical presentation of adaptive deficits in each of the three domains. DSM-5, at 33. Because most disagreement in this area surrounds the diagnosis of those with mild intellectual disability, in the discussion above I focus on the "specifiers" for that severity level to the exclusion of the more severe levels, given that it is unlikely there would be any serious disagreement regarding the diagnosis of a person with moderate to severe intellectual disability in any given case.

See also Brumfield v. Cain, --- U.S. ----, 135 S.Ct. 2269, 2281, 192 L.Ed.2d 356 (2015) ("intellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation' ") (quoting AAMR-10, at 8); Hill v. Anderson, 881 F.3d 483, 492 (6th Cir. 2018) (rejecting Ohio court's determination that defendant had failed to establish adaptive deficits; state court "veered off track when it disregarded the prevailing clinical practice documented in the medical literature by placing undue emphasis on Hill's adaptive strengths, as opposed to his adaptive weaknesses"); Commonwealth v. VanDivner, --- Pa. ----, 178 A.3d 108, 117 (2018) ("[T]he focus should be on an individual's weaknesses-not his or her strengths-as [intellectually disabled] people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family"; current clinical standards permit an individual to be classified as intellectually disabled "even though he may have relatively strong skills in distinct categories"); Williams v. State, 226 So.3d 758, 769 (Fla. 2017) (in evaluating adaptive deficits, a court "does not weigh a defendant's strengths against his limitations in determining whether a deficit in adaptive behavior exists. Rather, after it considers 'the findings of experts and all other evidence,' it determines whether a defendant has a deficit in adaptive behavior by examining evidence of a defendant's limitations, as well as evidence that may rebut those limitations") (citations omitted).

See Caroline Everington & J. Gregory Olley, Implications of Atkins v. Virginia: Issues in Defining and Diagnosing Mental Retardation , 8 J. Forensic Psychol. Prac., no. 1, 2008, at 1, 11 ("[P]erhaps most important, adaptive behavior is the individual's typical performance in his/her community setting. The details of the crime cannot be considered to be a sample of typical behavior.").

Some legal scholars have suggested that the DSM-5 relatedness requirement represents a significant departure from other diagnostic frameworks and imposes an additional burden on a person seeking to establish intellectual disability. See, e.g. , Moore, 137 S.Ct. at 1055 (2017) (Roberts, C.J., dissenting) (noting that, under the DSM-5, applicant would be required to show relatedness, in contrast to other frameworks that do not expressly include such a requirement). Clinicians, however, have largely rejected as incorrect this legal understanding that the "relatedness" language in the DSM-5 was intended to impose some additional or heightened burden on a person seeking to establish adaptive deficits; rather, the purpose of that language was to place greater emphasis on the adaptive functioning prong as compared to the IQ prong of the inquiry. See Tasse, Luckasson, and Schalock, The Relation Between Intellectual Functioning and Adaptive Behavior in the Diagnosis of Intellectual Disability , Intellectual and Developmental Disabilities , 2016 Vol. 54, No. 6, 381, 383; see also United States v. Wilson, 170 F.Supp.3d 347, 370-71 (E.D.N.Y. 2016) (rejecting interpretation of DSM-5 as imposing some heightened causation burden on a defendant; "where an individual has demonstrated significantly subaverage intellectual functioning, along with significant adaptive deficits that relate to such intellectual impairment, that individual has satisfied the first two diagnostic criteria for intellectual disability. To require this individual to further prove that he satisfies these criteria because he is intellectually disabled would render the criteria meaningless. ... [A] defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability.").

See also Rodriguez v. State , 219 So.3d 751, 757 (Fla. 2017) ("Medical standards indicate that experts cannot accurately evaluate adaptive functioning in a prison setting.") (citing AAIDD, The Death Penalty and Intellectual Disability , at 189 (Edward A. Polloway, ed., 2015) ).

See also Hill, 881 F.3d at 492-93 (criticizing Ohio courts for "relying too heavily on the observations of prison guards concerning Hill's behavior in the highly regimented environment of his prison block").

This Court received an amicus brief filed by the American Psychological Association, American Psychiatric Association, American Academy of Psychiatry and the Law, National Association of Social Workers, and National Association of Social Workers Texas Chapter. They observe that there are currently four contemporary scales used to diagnose limitations in adaptive behavior along with a forthcoming instrument. See J. Gregory Olley, Adaptive Behavior Instruments in The Death Penalty and Intellectual Disability , at 187-88 (Edward A. Polloway, ed., 2015). The four contemporary scales are the Adaptive Behavior Diagnostic Scale (Pearson, Patton & Mruzek, 2016); the Scales of Independent Behavior-Revised (Bruninks, Woodcock, Weatherman & Hill, 1996); the Adaptive Behavior Assessment System (Harrison & Oakland, 2015); and the Vineland Adaptive Behavior Scales (Sparrow, Cicchettif & Saulnier, 2016). The forthcoming instrument is the Diagnostic Adaptive Behavior Scale (Tasse et al, in press). Each of these instruments meets "contemporary standards for standardization, reliability, and validity." Id. at 189. When done according to the accepted clinical standards, these instruments help to ensure that the assessment of adaptive functioning is not wholly subjective.

See United States v. Hardy, 762 F.Supp.2d 849, 879-80, 901 (E.D. La. 2010) (noting that "use of standardized instruments is preferable when assessing a person's level of adaptive behavior"; the AAIDD standard "repeatedly emphasizes that a diagnosis of significant limitations should be made whenever a person has performance at least two standard deviations below the mean in any of the three domains (or in the total score)").

There are other considerations for evaluating adaptive deficits that do not appear to be directly applicable to this case or that this Court's majority opinion has accurately taken into account in this case and that do not need further discussion, such as cultural appropriateness, comprehensive review of underlying information, and co-occurring conditions.

Dr. Borda explained that a score below seven indicates severe impairment and "generally equates with very poor likelihood of gainful employment and poor ability to live independently[.]" Applicant had a score of one, which Dr. Borda testified was the lowest score he had ever recorded.

In her affidavit detailing her assessment of applicant, Dr. Anderson stated that she was retained to "help determine [applicant's] overall level of functioning. Specifically, the evaluation was conducted to determine the possibility and effects of organicity and/or acquired brain injuries." Dr. Anderson listed the following assessment tools: (1) unstructured clinical interview with applicant and his family; (2) review of records; (3) Mini-Mental Status Exam (MMSE); (4) Rey Complex Figure Test (RCFT); (5) Symbol Digit Modalities Test (SDMT); (6) Trails A and B; (7) Hooper Visual Organization Test (HVOT); (8) Controlled Oral Word Association Test (COWA); (9) California Verbal Learning Test-II (CVLT-II); (10) Delis-Kaplan Executive Functioning System (DKEFS); (11) Wide Range Achievement Test-4th edition (WRAT-4) math subtest; and (12) Wechsler Adult Intelligence Test-IV (WAIS-IV) math subtest.

In her affidavit, Dr. Anderson explained that the Trails A tests visual-motor processing speed by prompting the examinee to draw lines to connect consecutively numbered circles as quickly as possible. The Trails B tests visual-motor scanning, divided attention, and cognitive flexibility by requiring the examinee to draw lines to consecutively connect alternating numbers and letters as quickly as possible.

The DKEFS subtests administered were the Verbal Fluency tests and the Twenty Questions Test. Applicant scored in the moderately impaired range on each. The Verbal Fluency subtest required applicant to verbally give words that were associated with a stimulus, such as animals, in an allotted time. The Twenty Questions subtest is a measure of deductive reasoning.

In her affidavit, Dr. Anderson explained that the California Verbal Learning Test II (CVLT-II) is a test of verbal memory that requires the examinee to recall a list of sixteen words after a time delay that is repeated across five trials. Applicant was able to recall as many as six of the sixteen words from the original list after the fifth trial during some rounds. That level of ability indicates mild impairment and suggests a limited capacity to store information. During later rounds, applicant could recall only one of sixteen words. This performance is in the severely impaired range. Dr. Anderson noted that, although applicant has fairly intact memory skills, he may be able to retain only a definitive amount of information, as opposed to being able to employ strategies to recall beyond his limits, which suggests a reduced capacity to learn.

With respect to applicant's "verbal memory," Dr. Anderson found that his "performance was in the low average range, which it's not below average, it's just low average." She concluded that "what [applicant] learned, he actually could hold onto, it just took him several times to actually learn it. So, it's not the retention or the recall or the memory that's impaired; it's the acquisition, it's the brain's capacity to hold onto those 16 words and actually learn them." She continued by explaining, "[I]n my opinion, it speaks to the capacity of the brain to learn."

Dr. Anderson noted that the WAIS-IV math subtest is a clinical instrument used to assess cognitive abilities in adults age 16 to 90 years old. She used the test to gain a quantitative measure of applicant's abilities rather than to derive an IQ score. Similarly, the WRAT-4 math subtest measures an ability to perform basic computations through counting, identifying numbers, solving simple oral problems, and calculating written mathematics problems.

In her affidavit, Dr. Anderson explained that the Symbol Digit Modalities Test (SDMT) measures cognitive processing speed and requires visual scanning, visual discrimination, visual memory, fine motor skills, and cognitive speed. The SDMT employs two response trials consisting of written and oral response modes. The examinee is required to write a number associated with a novel symbol, with visual stimulus cues being continuously given. Applicant completed 32 of the 110 items, when writing responses. This score is in the borderline impaired range. Applicant did not make errors when completing this task but was slow when doing so.

The RFCT requires the examinee to copy an abstract figure with a visual stimulus card to assess visual processing and perceptual abilities; the HVOT provides a measure of visual organization and mental rotation ability by asking the examinee to view thirty items that are cut into puzzle-like pieces and determine what the stimulus might be when put together. Applicant completed the RCFT in 412 seconds, which is "very slow" compared to his normative group and placed him in the borderline-moderately impaired range. Applicant scored average on the HVOT.

The COWA entails giving verbal responses that begin with a particular letter within a one minute timeframe over several trials with different letters. Applicant produced a total of seventeen words yielding a raw score falling in the first percentile and in the deficient range. Dr. Anderson noted that when corrected for lack of education and grade attainment, applicant's score then fell in the eleventh percentile and in the low-average range.

Clinicians use the term "effort" to judge whether a person is feigning an inability to perform on a test. When a diagnostician determines that a person is exerting suboptimal effort, the diagnostician may undertake measures to determine whether the person is malingering. See Psychological Testing in the Service of Disability Determination 157, Committee on Psychological Testing, Including Validity Testing for Social Security Administration Disability Determinations, Institute of Health of the National Academies (2015) (discussing various performance validity measures and explaining that such measures assess the extent to which an individual is providing valid responses during cognitive or neuropsychological testing). "PVTs are typically simple tasks that are easier than they appear to be and on which an almost perfect performance is expected based on the fact that even individuals with severe brain injury have been found capable of good performance. On the basis of that expectation, each measure has a performance cut-off defined by an acceptable number of errors designed to keep the false-positive rate low. Performances below these cutoff points are interpreted as demonstrating invalid test performance." Id. at 155.

The Arc of the United States represents that it is the nation's largest community-based organization of and for people with intellectual and developmental disabilities. The Arc of Texas is an affiliate of that group.